# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 27, 2010

Lyle W. Cayce
Clerk

No. 07-31117

CHEVRON USA INC

Plaintiff - Appellee-Cross-Appellant

v.

AKER MARITIME INC; TECHNIP OFFSHORE ENGINEERING, INC;
TECHNIP OFFSHORE MOORINGS, INC; TECHNIP OFFSHORE INC,

Defendants - Appellants

T-3 CUSTOM COATING APPLICATORS, INC, formerly known as LSS-Lone
Star-Houston, Inc

Defendant - Appellant-Cross-Appellee

v.

TECH OFCO; OCEANEERING INTERNATIONAL, INC

Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana

Before JOLLY, BARKSDALE, and PRADO, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The Genesis Spar, an oil production facility, sits 150 miles south of New
Orleans in the Gulf of Mexico. A riser system attaches the floating spar to the
ocean floor, 2,600 feet below. The hub of this appeal, indeed of this entire

No. 07-31117

multiparty dispute, is the failed bolts used to secure the riser system.  Chevron USA, Inc. ("Chevron"), the part-owner and operator of the Genesis Spar, sued several parties to recover its costs resulting from the replacement of the failed bolts.  The dispute presented by this appeal is primarily between Chevron and T-3 Custom Coating Applicators, Inc. ("Lone Star"), the distributor and vendor of the bolts.  The case was tried to a jury, which returned a verdict, against several of the parties, in favor of Chevron for nearly $3 million in damages.  The jury found Lone Star liable based upon its status as a negligent vendor and, secondly, as an apparent manufacturer of the bolts, making it liable under the Louisiana Products Liability Act (the "LPLA"), La. Rev. Stat. § 9:2800.51, *et seq.*, and in redhibition, La. Civ. Code art. 2545.  The jury assigned 35 percent fault against Lone Star for Chevron's damages.  Based on the jury's determination that Lone Star was liable under Louisiana's redhibition articles, the district court required Lone Star to pay a portion of Chevron's attorney fees.  We hold that the evidence was sufficient for the jury to find Lone Star liable as an apparent manufacturer and we AFFIRM the judgment for damages.  We REVERSE the finding that Lone Star is liable under the Louisiana redhibtion articles and VACATE the judgment of attorney fees.  At the outset of the trial, the parties' contractual claims were reserved for determination by the district court, which essentially dismissed them after the jury returned its verdict in favor of Chevron.  We REMAND the contract claims to the district court for further consideration.

I.

Chevron hired Aker Maritime, Inc. ("Aker")[1] in 1998 to provide design and engineering services for the initial construction of the riser system.  Stability

---

[1] Aker Maritime, Inc. has gone through various incarnations throughout its relationship with Chevron, including as CSO Aker Maritime, Inc., Technip Offshore, Inc., and Technip USA, Inc.

problems plagued the riser system after its completion, leading to a crack in the spar's hull in 2000. Oceaneering International, Inc. ("Oceaneering") repaired the hull at Chevron's request, and Chevron put Aker in charge of designing a permanent fix. Large bolts called carriage bolts hold the riser system together, and Aker ordered the bolts from Lone Star, according to testimony a "well-known" bolt manufacturer that also distributed others' bolts. Aker initially requested eight-inch Grade 5 carriage bolts, which Chevron had approved. When Lone Star responded that it had no Grade 5 bolts, Aker placed an order for 2,092 Grade 2 carriage bolts, costing a total of $878.64. Instead of shipping Grade 2 bolts, Lone Star shipped Grade A bolts[2] manufactured by Oriental Fastener Co. ("Oriental").[3] At the time, Lone Star routinely substituted Grade A bolts for Grade 2 bolts, then a widespread practice in the fastener industry.

Lone Star shipped the bolts to Oceaneering, which was in charge of assembling the risers. The bolts were marked "OF," indicating the manufacturer, and arrived in shipping boxes bearing the Lone Star mark. They also arrived with a packing slip noting that they were either "manufactured or distributed" by Lone Star. Oceaneering accepted the bolts, failing to notice the substitution.

The first bolt failure occurred on July 9, 2001, when a bolt head popped off one of the first bolts used in the risers. Jack Couch, the project manager for Oceaneering, contacted Aker's Mike Harville and told Harville that he thought the bolts were a "serious weak link." Couch took a picture of the failed bolt and sent it to Harville. Harville told Oceaneering that it had applied too much

---

[2] Grade A and Grade 2 bolts are similar, but the standards are different in several respects. The most important difference in this case is that Grade 2 bolts require heating to a specific temperature keep them from breaking, whereas Grade A certification allows the manufacturer to determine what level of heat treatment is appropriate. At the time, Oriental routinely did not heat-treat its bolts at all.

[3] Oriental Fastener Co. is now known as Tech OFCO, and it is insolvent.

torque to the bolt, as Oceaneering was applying torque to Grade 2 bolts that it believed to be Grade 5 bolts. Oceaneering continued assembly of the riser system using the torque appropriate for Grade 2 bolts, apparently without incident. In August 2001, however, Aker took over riser assembly, and Oceaneering sent the parts, including the bolts, to Aker. Like Oceaneering's employees, Aker's employees failed to detect that the bolts were Grade A bolts.

After Aker completed installation of the riser system, Oceaneering divers inspected the construction on July 12 and 13, 2002. During the dives, live audio and video were fed to a room aboard the Genesis Spar, where Chevron representatives could see and hear everything the divers saw. As documented in Oceaneering's diving logs, the video inspection showed several bolt heads were missing. In addition, Harville testified that a Chevron employee, Bill Donahue, called him regarding a problem with bolt installation, likely on Sunday, July 14.

In the next month, Aker, Oceaneering, and Chevron representatives investigated the bolt failures. During the review, the team discovered that the bolts were Grade A, not Grade 2. It later determined that not only were the bolts the wrong kind, they were also defective due to a defective manufacturing process, including failure to stress-relieve the bolts and to heat-treat them.

Chevron sued on July 15, 2003, a year and a day after the Oceaneering dives, but less than a year after it completed its investigation. Its complaint included claims for negligence, strict liability, redhibition, products liability, and breach of contract. Aker brought claims for indemnity against Oceaneering and Lone Star. To avoid inconsistent verdicts, the parties agreed to try all the claims other than the contract claims to a jury, after which the district court would make factual findings based on the trial record and render judgment on the contract claims. The jury returned a verdict in favor of Chevron on all claims. It found that none of Chevron's claims were prescribed. As to negligence, it found Aker, Lone Star, Oriental, and Oceaneering were all negligent and it

4

apportioned fault under La. Civ. Code art. 2323: 40 percent to Aker,[4] 35 percent to Lone Star, 5 percent to Oceaneering, and 20 percent to Oriental. It determined that Lone Star and Oriental were manufacturers and imposed liability in redhibition and under the LPLA. Finally, it determined that Chevron's total damages were $2,968,526.42.

On September 12, the district court determined that "[t]he jury verdict clearly, and in all respects, trumps the so-called 'contractual issues.'" In the same order, it directed the magistrate judge to determine the attorney fees owed by Lone Star and Oceaneering under La. Civ. Code art. 2545 and noted, "It seems to me that the [Lone Star and Oriental] should split the amount due by the percentage of fault the jury attributed to each; and that the total fee should only cover that part of the recovery attributed to the liability of the two manufacturers." On October 12, the district court entered judgment, apportioning the damages according to the jury's fault allocation, regardless of the theory of liability. Lone Star and Aker moved for judgment as a matter of law, which the district court denied. Chevron, Lone Star, and Aker timely appealed.

On January 2, 2008, the magistrate judge recommended $431,906.63 in attorney fees for Chevron. After reviewing the relevant Louisiana case law, he concluded that Oriental and Lone Star should be solidarily liable for the amount. The district court delayed consideration of the magistrate judge's recommendation pending the Louisiana Supreme Court's decision in *Aucoin v. Southern Quality Homes, LLC*, 984 So. 2d 685 (La. 2008), which it hoped would resolve whether co-defendants are solidarily liable for damages in redhibition. Because the supreme court did not reach that issue, *id.* at 693, the district court simply confirmed its original impression that Lone Star and Oriental should

---

[4] The 40 percent figure includes two separate allocations, both of which concern the companies treated collectively as "Aker."

split the fees according to fault in a February 29 order. On March 18, it entered judgment, with Lone Star to pay $151,167.32 and Oriental to pay $86,381.33. Chevron would not be able to collect the remaining $194,357.98 in attorney fees. Chevron timely appealed this judgment.

Before oral argument, Chevron and Aker reached a settlement, in which Aker paid a sum to Chevron but admitted no fault, after which those parties voluntarily dismissed their appeals insofar as they were adverse to one another. Remaining before us are three parties' appeals: Lone Star's, contending that Chevron's claims against it are prescribed, that insufficient evidence supports the jury's verdict, and that its LPLA liability precludes an award of attorney fees in redhibition; Chevron's, arguing that Lone Star and Oriental should be solidarily liable in redhibition and that the district court erred in dismissing its contract claim against Lone Star; and Aker's, arguing that the district court erred in dismissing its contract claims for indemnity against Lone Star and Oceaneering.

## II.

We begin with an overview of our disposition of the case. We first consider Lone Star's appeal, as its resolution allows us to dispose of Chevron's appeal. We first consider Lone Star's arguments that Chevron's claims are prescribed, and we determine that the jury had sufficient evidence to conclude that they are not. We then proceed to the jury's conclusion that Lone Star owes Chevron damages. The jury found liability on three theories, negligence, the LPLA, and redhibition. Affirming any one theory of liability would support the jury's entire award of compensatory damages, so we consider only the LPLA action, because, as we later discuss, Lone Star's LPLA liability has conclusive impact on the merits of other appeals. After a discussion of the relevant law, we consider the evidence presented to the jury and determine that the evidence is sufficient to hold Lone Star liable under the LPLA's apparent-manufacturer doctrine. After

upholding the jury's verdict of LPLA liability against Lone Star, we turn to Lone Star's challenge to the award of attorney fees for Chevron. The district court awarded attorney fees based on the jury's finding of liability in redhibition, but Lone Star argues that Chevron's exclusive remedy lies under the LPLA, which does not allow for attorney fees. We conclude that Lone Star is correct, and we vacate the district court's award of attorney fees. We therefore pretermit consideration of Chevron's argument that Lone Star and Oriental should be solidarily liable in redhibition. Finally, we reach Chevron and Aker's argument that the district court improperly dismissed their contract claims. Unable to determine the basis for the district court's dismissal of these claims, we remand for further consideration and explanation.

## III.

We begin with our discussion of Lone Star's appeal. As we have said, the jury considered three theories of liability against Chevron: negligence, the LPLA, and redhibition. It found Lone Star liable under all three. Lone Star first argues that Chevron's claims under all three theories are prescribed. Alternatively, if the claims are not prescribed, Lone Star argues that it owes no damages because the evidence is insufficient to establish liability on any of the claims. Finally, it argues that if it is liable under the LPLA, it is not required to pay any of Chevron's attorney fees.

We review *de novo* the district court's decision on the Rule 50 motion. *E. Tex. Med. Ctr. Reg'l Healthcare Sys. v. Lexington Ins. Co.*, 575 F.3d 520, 525 (5th Cir. 2009). "[T]he court must review all of the evidence from the record, draw all reasonable inferences in favor of the nonmoving party, and may not make any credibility determinations or weigh the evidence." *Id.* (citations and quotations omitted). We will reverse the jury's verdict only if, upon reviewing all the evidence presented to the jury in the light most favorable to the verdict, we

determine that the verdict rests only on "mere speculation and conjecture." *Anthony v. Chevron USA, Inc.*, 284 F.3d 578, 583 (5th Cir. 2002).

## A.

Lone Star first argues that Chevron's claims are prescribed because Chevron did not file this action within a year of the claims' accrual. Under the doctrine of *contra non valentem*, the prescriptive period begins to run "on the date the injured party discovers or should have discovered the facts upon which his cause of action is based." *Griffin v. Kinberger*, 507 So. 2d 821, 823 (La. 1987).

The parties' primary disagreement focuses on how much information is necessary to commence the prescriptive period. Lone Star relies on cases invoking *Cartwright v. Chrysler Corp.*, in which the Louisiana Supreme Court wrote:

> Whatever is notice enough to excite attention and put the owner on his guard and call for inquiry is tantamount to knowledge or notice of every thing to which inquiry may lead and such information or knowledge as ought to reasonably put the owner on inquiry is sufficient to start the running of prescription.

232 So. 2d 285, 287 (La. 1970). This rule would seemingly start prescription as soon as a potential plaintiff suspected something was wrong. But that is not the law. *Jordan v. Employee Transfer Corp.*, 509 So. 2d 420, 423 (La. 1987) ("The court of appeal . . . paraphrased the same dicta, as if it had been the rule in *Cartwright*. It was not."). "Constructive knowledge or notice sufficient to commence the running of prescription . . . requires more than a mere apprehension something might be wrong." *Strata v. Patin*, 545 So. 2d 1180, 1189 (La. Ct. App. 4th Cir. 1989). But when a plaintiff suspects something is wrong, he must "seek out those whom he believes may be responsible for the specific injury." *Jordan*, 509 So. 2d at 423. When a plaintiff acts reasonably to discover the cause of a problem, "the prescriptive period [does] not begin to run until [he

No. 07-31117

has] a reasonable basis to pursue a claim against a specific defendant." *Id.* at 424.

In the light of these principles, we conclude the jury had a sufficient basis to find that the prescriptive period had not run before Chevron filed suit. Lone Star first argues that the prescriptive period should have begun when the first bolt broke in 2001, but the evidence showed all involved had cause to conclude that the bolt failure resulted only from excess torque. Oceaneering and Aker adjusted the torque specifications, and no one saw any further bolt problems until the final inspection. Because Chevron and its agents had cause to conclude that the problem was overtorquing traceable to Oceaneering, not faulty bolts traceable to Lone Star, the jury was entitled to determine that the prescriptive period did not start at that time. Similarly, the jury could reasonably conclude prescription did not start in July 2002. Aker's Mike Harville testified that after the dives showed more broken bolts, no one knew the cause. It could have been continued overtorquing, faulty manufacture, or improper bolt substitution. Each problem pointed to a different defendant. Chevron and others immediately launched an investigation, which produced several theories as to who was responsible the next month, less than a year before it filed suit. Thus, the jury was entitled to conclude prescription did not bar Chevron's claims against Lone Star.

## B.

We turn now to the jury's imposition of liability. As we have earlier indicated, the jury found Lone Star liable on three theories: negligence, redhibition, and the LPLA. Lone Star provides numerous arguments that the jury lacked sufficient evidence for each theory. Because each theory supports the same damages, it is necessary only to affirm one basis of liability.[5] Finding

---

[5] Neither the jury's verdict nor the district court's judgment indicates in any way that the damages for which Lone Star is responsible vary according to theory of liability.

No. 07-31117

sufficient evidence to support the jury's LPLA verdict, we affirm the district court's award of compensatory damages on that basis.

The LPLA provides remedies for claimants, harmed by an unreasonably dangerous product, against the manufacturer. La. Rev. Stat. § 9:2800.54(A). The jury determined that Lone Star was a manufacturer of the bolts and, accordingly, that Lone Star owed damages under the LPLA.[6] Lone Star argues that the jury erred in holding it liable under the LPLA, because it did not manufacture the bolts—it only sold them. The LPLA's definition of manufacturer is not limited, however, to those who actually manufacture a product; one "who labels a product as his own or who otherwise holds himself out to be the manufacturer of the product" is also considered a manufacturer of the product. *Id.* § 2800.53(1)(a). Lone Star argues that it cannot be held liable as the bolts' apparent manufacturer, because the jury lacked sufficient evidence to determine that Lone Star held itself out as the manufacturer. After reviewing the apparent-manufacturer doctrine, we conclude that the evidence is sufficient to support the jury verdict.

---

[6] Chevron pleaded damages based on a defective product only in redhibition and negligence in its original and amended complaints, never mentioning the apparent-manufacturer theory or the LPLA. Nevertheless, the district court listed "[w]hether Lone Star is a manufacturer under the Louisiana Products Liability Law" as a contested legal issue in its pretrial order. Chevron presented evidence relating to apparent-manufacturer status without objection; indeed, most of that evidence was relevant to the redhibition claims against Lone Star as an alleged bad-faith seller. When Lone Star moved for judgment as a matter of law at the close of Chevron's evidence, it objected to the theory's inclusion and did so again when the district court was proposing the jury instructions and in its Rule 50 motion. The district court overruled the objections, reasoning that the pretrial order supersedes the pleadings. Failing to include a theory of liability in the complaint can, in some cases present a meritorious issue on appeal. *Deere & Co. v. Johnson*, 271 F.3d 613, 621 (5th Cir. 2001). Here, however, Lone Star, which has shown no prejudice by the failure to allege the theory in Chevron's complaints, must have determined that there is not a substantial question presented, because on appeal, with only a cursory mention, it has waived the issue by failing to brief it. *L & A Contracting Co. v. S. Concrete Servs., Inc.*, 17 F.3d 106, 113 (5th Cir. 1992).

1.

Neither our court nor the Louisiana Supreme Court has considered the scope of the apparent manufacturer doctrine as reflected in the LPLA. We are, however, not without guidance. Louisiana courts have held apparent manufacturers liable in the same capacity as manufacturers since 1967. *Penn v. Inferno Mfg. Corp.*, 199 So. 2d 210, 214-15 (La. Ct. App. 1st Cir. 1967) (citation omitted). The *Penn* court reasoned that " 'where the vendor puts only its name upon the product without indicating that it is actually the product of another then the public is induced by its reasonable belief that it is the product of the vendor to rely upon the skill of the vendor and not upon the skill of any other.'" *Id.* at 215 (quoting *Carney v. Sears, Roebuck & Co.*, 309 F.2d 300, 304 (4th Cir. 1962)). The Louisiana Supreme Court later relied on *Penn* in *Media Production Consultants, Inc. v. Mercedes-Benz of North America, Inc.*, holding Mercedes-Benz's American distributor was a manufacturer because it was solely responsible for marketing the cars domestically and its name appeared on the manuals and service policies. 262 So. 2d 377, 380-81 (La. 1972) ("Insofar as the American consumer is concerned, [the distributor] occupies the position of the manufacturer."). Six years later, the court explicitly approved liability against Sears, Roebuck & Co. under the apparent-manufacturer doctrine, because it "held the product out to the public as its own." *Chappuis v. Sears Roebuck & Co.*, 358 So. 2d 926, 928-29 (La. 1978) (defective hammer bore Sears's Craftsman mark but no indication of the actual manufacturer). When the legislature codifies a common-law rule, it adopts the exceptions and interpretations from the common law. *State v. Taylor*, 642 So. 2d 160, 163 (La. 1994). When Louisiana jurisprudence does not answer a question presented under a common-law doctrine, the Louisiana Supreme Court has looked to other jurisdictions' interpretations of the doctrine to inform its interpretation. *See, e.g.*, *Roberts v. Benoit*, 605 So. 2d 1032, 1036 (La. 1991) (considering other states' cases on

negligent handling of a firearm by an off-duty officer). Thus, while our analysis of this issue includes section 2800.53(1)(a) and cases interpreting it, we also look to pre-LPLA Louisiana cases and other common-law sources.

Since *Chappuis*, the Louisiana courts have more fully developed the apparent-manufacturer doctrine. As a general rule, it takes very little under Louisiana law to present a jury issue if a product does not bear the actual manufacturer's mark. For example, an unlabeled bungee cord with a price tag reading "ACE PRICE $ $2.95" was enough to survive summary judgment on the claim that Ace Hardware, the seller of the cord, held itself out as the cord's manufacturer. *Louviere v. Ace Hardware Corp.*, 915 So. 2d 999, 1002 (La. Ct. App. 3d Cir. 2005); *see also Cooke v. Fairmont Hotel Co.*, Civ. A. No. 90-4759, 1993 WL 35146, at *1 (E.D. La. Feb. 5, 1993) (shipping labels with the vendor's name were the only indication of provenance). Louisiana's appellate courts have expanded the doctrine beyond those cases, such as *Penn* and *Chappuis*, in which the product suggested only the seller as a possible manufacturer. Even a statement that the product was manufactured by an anonymous third party or the presence of the actual manufacturer's name on the product may not be sufficient to protect a seller from liability. *Peterson v. G.H. Bass & Co.*, 713 So. 2d 806, 808 (La. Ct. App. 4th Cir. 1998) (label noted that product was "manufactured for" the distributor whose logo appeared on the product); *Rutherford v. Cola-Cola Bottling Co. of Shreveport, Inc.*, 501 So. 2d 1082, 1085-86 (La. Ct. App. 2d Cir. 1987) (product indicated actual manufacturer). This threshold for apparent manufacturer liability has led to the observation that "[h]olding out a product in any significant manner as one's own is likely to earn one the label 'manufacturer.' " *Chastant v. SBS-Harolyn Park Venture*, 510 So. 2d 1341, 1344 (La. Ct. App. 3d Cir. 1987); *Matthews v. Wal-Mart Stores, Inc.*, 708 So. 2d 1248, 1251 (La. Ct. App. 4th Cir. 1998) (Plotkin, J., dissenting) (quoting *Chastant*, 510 So. 2d at 1344). On the other hand, courts have reversed jury

verdicts when upholding the verdict would allow apparent-manufacturer liability for any seller who sold a product. *See, e.g.*, *Matthews*, 708 So. 2d at 1249 ("The court is surely not in the position to hold that any seller of a new lamp made in China is liable for unknown defects."); *Pilet v. Ciba-Geigy Corp.*, Civ. A. No. 96-021, 1996 WL 89262, at *2 (E.D. La. Feb. 28, 1996) (legally-required drugstore label on prescription bottle did not constitute holding out by the drugstore). Beyond product labeling, courts have also considered whether the product itself left the consumers with the impression that the seller was the manufacturer and whether the seller had a reputation as a manufacturer in its market. *Peterson*, 713 So. 2d at 808 (witnesses "remembered very little about the products' labels, except that they identified [the distributor] as the maker"); *Penn*, 199 So. 2d at 217 (noting that the "gauge is well known in the oil fields of South Louisiana" and identified with the distributor); *see also Hebel v. Sherman Equip.*, 442 N.E.2d 199, 203 (Ill. 1982) ("It is thus apparent that whether a holding out has occurred must be judged from the viewpoint of the purchasing public, and in light of circumstances as of the time of purchase."). Courts have also considered marketing materials and product guarantees. *Landry v. State Farm Fire & Cas. Co.*, 504 So. 2d 171, 173-74 (La. Ct. App. 3d Cir. 1987).

Most striking are the two cases in which the packaging indicated that the distributor was not the manufacturer, but the court nevertheless held the distributor to be the apparent manufacturer. In *Rutherford*, a consumer who found a roach in his can of Coca-Cola sued the local bottling and distribution company, even though the local distributor had not actually canned—*i.e.*, manufactured—the beverage containing the roach. 501 So. 2d at 1085. Indeed, the can identified the actual bottler on the back. *Id.* The evidence showed that the local bottling company distributed drinks that it canned and those canned by the canner of the roach-bearing drink. *Id.* In all respects other than the

small notice on the back, the actual canner's cans were apparently the same, including the  large Coca-Cola logo on the front. *Id*. Therefore,

> the local Coca-Cola bottling company, which is a bottler (manufacturer) of soft drinks and is the distributor of Coca-Cola in an area, should be regarded as a manufacturer of all Coca-Cola products it distributes, even though a certain product (the canned Coke in this instance) was not actually canned by the local company but was canned by a company formed by local bottlers for the purpose of providing canned Coca-Cola for distribution by local bottling companies.

*Id*. It emphasized, "[t]he fact that the label contains a small print identification of the actual manufacturer is of no consequence." *Id*. at 1085-86. Similarly, in *Peterson*, the label "clearly stated" in small print on the back of the can of shoe-care product, "Manufactured *for* G.H. Bass & Co." 713 So. 2d at 806 (emphasis added). That could not overcome the label on the front that said "Bass" in large print and the witnesses' recollection that the labels "identified Bass as the maker." *Id*. In both cases, the other evidence of public understanding that the seller manufactured the product (and the potential for reliance on that understanding) overcame inconspicuous markings indicating that someone else was the actual manufacturer. Thus, these Louisiana cases tend to demonstrate that when the distributor's actions give the buying public a basis to assume that it may be the manufacturer of a product it distributes, a jury will usually be within its province to conclude that the distributor held itself out as the product's manufacturer, even though the indications may be less than clear and the ambiguity as to the actual manufacturer may subsequently be clarified.

These developments are consistent with the prevailing common-law doctrine of apparent-manufacturer liability. As the Restatement (Second) of Torts, on which the Louisiana Supreme Court relied when it first imposed manufacturer liability on a seller in *Media Production Consultants*, explains:

14

No. 07-31117

The mere fact that the goods are marked with such additional words as "made for" the seller, or describe him as a distributor, particularly in the absence of a clear and distinctive designation of the real manufacturer or packer, is not sufficient to make inapplicable the [designation as apparent manufacturer]. The casual reader of a label is likely to rely upon the featured name, trade name, or trademark, and overlook the qualification of the description of source. . . . However, where the real manufacturer or packer is clearly and accurately identified on the label or other markings on the goods, and it is also clearly stated that another who is also named has nothing to do with the goods except to distribute or sell them, the latter does not put out such goods as his own. That the goods are not the product of him who puts them out may also be indicated clearly in other ways.

Restatement (Second) of Torts § 400 cmt. d; *Media Prod. Consultants*, 262 So. 2d at 380-81 (citing § 400). None of the cases considered above imposed apparent-manufacturer liability beyond the boundaries of the Restatement. Given the Louisiana Supreme Court's previous reliance on section 400, we conclude that the opinions discussed above are consistent with how the Louisiana Supreme Court would treat the apparent-manufacturer doctrine. Having reviewed the doctrine's contours, we turn now to the evidence.

2.

Considering the evidence in the light of the principles we have just examined, we hold that the jury had enough evidence to conclude Lone Star held itself out as a manufacturer. The jury heard evidence that Lone Star was "well-known" as a bolt manufacturer.[7] Chevron's agent, Aker, dealt directly and exclusively with Lone Star in purchasing bolts, and Lone Star did nothing to inform Aker that the bolts it sold were not its own. Instead, it shipped the bolts in Lone Star-labeled boxes and included a packing slip indicating that Lone Star

---

[7] Aker's Jeff Measemer testified that although Lone Star was a known bolt manufacturer, he was not sure if Lone Star's manufacturing reputation extended to bolts with heads, such as the carriage bolts at issue here.

15

possibly manufactured the bolts in question.[8] It is true that the bolts had small "OF" markings on their heads. Although a bolt purchaser might have reasonably understood that the marking suggested someone other than Lone Star likely manufactured the bolts, the Oceaneering employee who photographed the bolts upon receipt was left with the impression that the bolts were Lone Star bolts, not Oriental Fastener bolts. *See Peterson*, 713 So. 2d at 808; *Hebel*, 442 N.E.2d at 203 (holding out evaluated from standpoint of the "purchasing public").[9] When considered in the context of the other evidence that Lone Star held itself out as a manufacturer, this one piece of evidence will not cause us to reverse the jury's interpretation of the facts before it.

Lone Star's argument on appeal has focused on the negative consequences of allowing a box's label to trigger apparent-manufacturer liability. We are not unsympathetic to the argument that vendors should not face liability simply because they package the products they sell in boxes bearing their logos. Anyone who has purchased a book from Amazon.com understands that the box's logo is not necessarily a sign of who manufactured the product. Indeed, placing the seller's logo on a box can serve a useful purpose in identifying the contents to the consumer. If the boxes were the only evidence against Lone Star, the cases would indicate a different decision. *See Matthews*, 708 So. 2d at 1249 (refusing to impose liability on any seller of a lamp sporting a "Made in China" label). But clearly there is more here; the boxes are not the only evidence.

---

[8] The slip read, "Fasteners shipped on this sales order have been manufactured or distributed by LSS Lone Star – Houston in accordance with our documented quality system."

[9] In *Rutherford* and *Peterson*, there were explicit statements that someone else—not the distributor—manufactured the products. An "OF" on the bolts' heads, standing alone, is not as clear an indication that someone other than Lone Star manufactured the bolts as was present in those cases. *Accord* Restatement (Second) of Torts § 400 cmt. d (suggesting a "clear statement" that the distributor was not the manufacturer would avoid apparent-manufacturer status).

No. 07-31117

Nor does our decision allow every manufacturer who also distributes others' products to be held liable as an apparent manufacturer. As a manufacturer of bolts, Lone Star is in a position to make it clear to consumers which products it makes and which it does not. *See Coulon v. Wal-Mart Stores, Inc.*, 734 So. 2d 916, 920 (La. Ct. App. 1st Cir. 1999) ("Assuming PBS was the entity which actually assembled the bicycle, Wal-Mart admittedly did not give any notice to its customers . . . that a separate entity assembled the bicycles for sale at the Houma Wal-Mart store."). Lone Star easily could have informed Aker that the bolts it was selling were not its bolts, but that it had resorted to bolts from an overseas manufacturer. It did not. In this regard, we reiterate that we extend the apparent manufacturer designation no further than Louisiana's courts already have, and not as far as the courts did in *Rutherford* and *Peterson*.

C.

We turn now to the district court's award of attorney fees, which are allowable only if Chevron has a redhibition claim under La. Civ. Code art. 2545.[10] The district court awarded Chevron attorney fees based on the jury's determination that Lone Star was a manufacturer that breached the seller's warranty against redhibitory defects and ordered Lone Star to pay Chevron $151,167.32. Lone Star now argues that Chevron does not meet the requirements for an award of attorney fees under art. 2545, and even if it does meet the article's requirements, the LPLA precludes Chevron's redhibition claim and consequently an award of attorney fees. We address Chevron's claim under art. 2545 first, and then turn to Lone Star's LPLA preclusion argument.

---

[10] La. Civ. Code art. 2545 provides:

A seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for . . . attorney fees . . . .

17

No. 07-31117

Under the redhibition articles, a seller warrants to the buyer that the thing it is selling is free of hidden redhibitory defects and fit for its ordinary use. La. Civ. Code arts. 2520, 2521, & 2524; *see generally Aucoin*, 984 So. 2d at 690-92 (explaining the origins and purpose of the redhibition action). A defect is redhibitory when the defect diminishes the thing's value in such a way that one would presume the buyer would only have purchased the thing for a reduced price or not at all. La. Civ. Code art. 2520. The degree of the seller's liability varies according to whether the seller knew of the defect. If he did not know of the defect, the seller must have an opportunity to cure the defect, either through repair or replacement. *Id.* arts. 2522 & 2531. If the seller cannot cure the defect, the buyer is entitled to rescission and the reasonable expenses occasioned by the sale. *Id.* The law is more demanding of the seller who knows of the defect. The seller is entitled to no opportunity to cure, and the seller in bad faith must pay for damages, plus reasonable attorney fees. *Id.* arts. 2522 & 2545. Manufacturers are conclusively presumed to know of defects in their products, *id.* art. 2545 cmt. (d), and consequently, a manufacturer of a defective product is liable for a buyer's reasonable attorney fees.

Lone Star does not dispute the jury's determination that it was a seller, and we have already held that Lone Star is the bolts' manufacturer under the apparent-manufacturer doctrine. It is the third element that Lone Star disputes: that Chevron is a buyer. It does so on grounds that Aker, not Chevron, was the actual purchaser of the bolts from Lone Star, so there was no privity between Lone Star and Chevron. This argument has no force, however, as Louisiana long ago abandoned the privity requirement in redhibition. *Aucoin*, 984 So. 2d at 692. Accordingly, Chevron seemingly meets art. 2545's basic requirements for an award of attorney fees.

There is a hitch, however; it is the LPLA. We have affirmed Lone Star's liability under the LPLA, which "establishes the exclusive theories of liability for

18

No. 07-31117

manufacturers for damage caused by their products" and explicitly provides that "[a]ttorney's fees are not recoverable under th[e LPLA.]" La. Rev. Stat. §§ 9:2800.52 (LPLA exclusivity) & 2800.53(5) (attorney fees prohibition). "Damage" under the LPLA, however, is a defined term, and it usually does not include "damage to the product itself [or] economic loss." *Id.* § 2800.53(5). Accordingly, the parties agree that the LPLA precludes Chevron's redhibition claim—and, consequently, its entitlement to attorney fees—unless the jury awarded damages to compensate for "damage to [the bolts themselves or] economic loss," which are recoverable in redhibition. *See id.* § 2800.53(5); *Aucoin*, 984 So. 2d at 691 n.8; *De Atley v. Victoria's Secret Catalogue, LLC*, 876 So. 2d 112, 115 (La. Ct. App. 4th Cir. 2004). Chevron acknowledges that it did not submit evidence for the jury to award damages based on damage to the bolts themselves, but it argues the cost of repairing the spar is "economic loss" under the LPLA, entitling it to attorney fees. We believe Chevron is incorrect.

As explained by the Supreme Court, the economic loss doctrine prevents a plaintiff from recovering for damage to the product itself or losses that arise from the plaintiff's inability to use the product. *E. River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 867-70 (1986). The purpose of the doctrine is to maintain the traditional distinction between contract and tort. *Id.* at 871-75; *accord In re Chinese Manufactured Drywall Prods. Liability Litigation*, — F. Supp. 2d —, 2010 WL 277063, at *7-8 (E.D. La. Jan. 13, 2010) (providing an up-to-date overview of the economic loss rule). When a product damages other property or causes personal injury, the action is for an unsafe product in tort. *Transamerica Delaval*, 476 U.S. at 871. If the damage is instead to the product itself or a loss of profits, the action properly is in warranty or contract, for responsibility for those damages can more reasonably be the subject of negotiations. *Id.* at 871-72. Turning to the typical application, in *Transamerica Delaval*, the Supreme Court held that a ship's purchaser could not

19

No. 07-31117

recover for a malfunctioning turbine in tort when the only damage was to the turbine. *Id.* at 875. By contrast, in the asbestos context, most courts have not considered the cost of removing the material from buildings an economic loss, because the product renders the building (other property) unusable. *Chinese Drywall*, 2010 WL 277063, at *15-17.[11] In interpreting the LPLA, courts have recognized this distinction. *E.g.*, *De Atley*, 876 So. 2d at 115-16. In *De Atley*, Louisiana's Fourth Circuit included as examples of LPLA damages "pain and suffering, medical expenses, damages to property, other than to the product itself, and loss of consortium." *Id.* at 116 n.2 (citing John Kennedy, *A Primer on the Louisiana Products Liability Act*, 49 La. L. Rev. 565, 579-80 (1989)). On the other hand, "economic loss would include the cost of the product, and the loss of income or profits resulting from the loss of or inability to use the product as intended." *Id.* The scholarly authorities are consistent with this approach.[12]

---

[11] *Accord* Vincent R. Johnson, *The Boundary-Line Function of the Economic Loss Rule*, 66 Wash. & Lee L. Rev. 523, 550-51 (2009) ("[I]f a person buys a can of paint and applies the paint to a door, the person has a potential tort claim . . . if toxic odors from the paint make the plaintiff sick or if the paint eats away at the door and damages that 'other' property. However, if the paint simply fails to adhere to the door effectively and flakes off, or quickly discolors, causing no other damage but making the paint's purchase a waste of money, the buyer's sole avenue for recovery is rooted in contract principles.").

[12] Consider two leading analyses of the LPLA. Kennedy writes,

[T]he LPLA governs products liability in tort and recovery under the statute will normally be limited to recovery for personal injury and *damage to property other than the product itself*, which properly are the subject of a liability tort claim. Recovery for damage to the product itself or economic loss arising from a deficiency in or loss of use of the product will normally not be compensable under the LPLA, because those items of damage properly are the subject of a claim in redhibition for breach of implied warranty. If, however, a claimant cannot proceed in redhibition for some reason, he can recover his damages in redhibition under the LPLA.

Kennedy, *supra*, at 580 (emphasis added). Crawford provides an example that reflects the same interpretation:

[I]f the plaintiff bought a dump truck with defective brakes and in an ensuing

20

No. 07-31117

When a product damages other property, compensation is under the LPLA, not the redhibition articles.

In the light of these authorities, Chevron's damages incurred repairing the spar are not economic loss. The undisputed facts here show that the defective products, the bolts, have damaged other property, the spar. That damage is not economic loss—the claim is not that the bolts were "a waste of money" or caused lost profits, Johnson, *supra*, at 551—but property loss, so Chevron's damages are entirely under the LPLA, not in redhibition.

Chevron's cited cases are consistent with this rule. *See In re Ford Motor Co. Vehicle Paint Litig.*, No. MDL 1063, 1996 WL 426548 (E.D. La. July 30, 1996); *Bearly v. Brunswick Mercury Marine Div.*, 888 So. 2d 309, 312 (La. Ct. App. 2d Cir. 2004); *Dixie Roofing Co. v. Allen Parish Sch. Bd.*, 690 So. 2d 49 (La. Ct. App. 3d Cir. 1996); *Brown v. Dauzat*, 157 So. 2d 570 (La. Ct. App. 4th Cir. 1991); *Griffin v. Coleman Oldsmobile, Inc.*, 424 So. 2d 1116 (La. Ct. App. 1st Cir. 1982). Only one of the cited cases allows a buyer to recover against a seller for damages to any property other the product itself, and the basis for those damages was breach of contract, not redhibition. *Dixie Roofing*, 690 So. 2d at 56. Further, whether the LPLA preempted the damages claim was not at issue in that case, so even had the damages been in redhibition, the case would shed little light on our case. The rest of the cases award damages to cover repair cost to the product made by the manufacturer, a situation clearly distinguishable from this case. *E.g.*, *Bearly*, 888 So. 2d at 300 (considering a suit by a purchaser

---

crash suffered personal injuries, total loss of the truck, and loss of his hauling contracts, he would claim under the [LPLA] for his personal injuries, and would cumulate with that claim an action in redhibition against the manufacturer for the loss of the truck itself, the economic loss of his hauling contracts, and for attorney fees under the redhibition claim.

William E. Crawford, *The Louisiana Products Liability Act*, 36 La. B.J. 172, 173 (1988).

No. 07-31117

against a boat manufacturer for return of the purchase price of the boat based on a faulty engine).

In sum, the nature of the damages awarded Chevron precludes Lone Star's liability in redhibition. Because attorney fees are available only in connection with liability under the redhibition articles, we reverse the district court's judgment awarding those fees. Consequently, we do not address Chevron's argument that Lone Star and Oriental should be solidarily liable for such fees.[13]

IV.

We turn now to the contract claims of Chevron and Aker. As we have already indicated, Chevron also sued Lone Star for breach of contract, and Aker sued Lone Star and Oceaneering for indemnity under the relevant contracts. The parties agreed that the district court would decide the contract claims after the jury's verdict to avoid the possibility of an inconsistent verdict. After the jury reached its verdict, the district court concluded that the verdict "trump[ed] the so-called 'contractual issues'" and dismissed all of the claims. Because neither we, nor the parties, are certain what the district court meant by this statement, we remand those issues to the district court for "further consideration and for fuller explanation." *In re Blast Energy Servs., Inc.*, 593 F.3d 418, 428 (5th Cir. 2010). It may ultimately be that dismissing the claims was the right course, but without an explanation, we are in no position to review the decision at this time.

V.

We recap what we have decided in the opinion. First, we have upheld the jury verdict that Chevron's claims against Lone Star are not prescribed. The jury had sufficient evidence to conclude that Chevron lacked sufficient

---

[13] Because we determine the LPLA preempts Lone Star's redhibition liability, Chevron's argument in its cross-appeal that Lone Star and Oriental should be solidarily liable in redhibition is moot.

information to bring a claim more than a year before it filed suit.   Second, we have held that the jury had sufficient evidence to conclude Lone Star was liable to Chevron under the LPLA as a manufacturer whose products caused damage to the spar.  A seller is a manufacturer under the LPLA if it holds a product out as its own, and after reviewing the case law and the evidence, we have concluded that under Louisiana law the jury had sufficient evidence to conclude Lone Star was an apparent manufacturer.  Third, we have reversed the judgment awarding attorney fees.  The parties agreed that Chevron could only recover attorney fees in redhibition, and they further agreed that the LPLA preempted Chevron's redhibition claim unless Chevron's repair costs were "economic loss" under the LPLA.  We have concluded that the damages constituted damages to other property, not economic loss, so the LPLA preempted the jury's verdict as to redhibition.  With the redhibition claim thus out of the picture, we did not address Chevron's argument that Lone Star and Oriental should be solidarily liable in redhibition.  Concerning the contract claims of Chevron and Aker, we have been unable to determine why the district court dismissed the claims, so we remanded them for further explanation and consideration in the light of our holding.

In sum, we AFFIRM the district court's judgment awarding compensatory damages against Lone Star to Chevron, but we REVERSE its judgment awarding attorney fees.  We REMAND for further consideration of the contract claims.

AFFIRMED in part; REVERSED in part; and REMANDED.