# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 18, 2025

Lyle W. Cayce
Clerk

———————————

No. 24-30386

———————————

Allied World National Assurance Company,

*Plaintiff—Appellant*,

*versus*

Nisus Corporation,

*Defendant—Appellee*.

———————————————————————

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:21-CV-431

———————————————————————

Before Graves, Higginson, and Wilson, *Circuit Judges*.
Cory T. Wilson, *Circuit Judge*:

This products-liability case arises out of a $200 million mixed-use development on the campus of Louisiana State University. Soon after the project was completed in 2018, pipes in the buildings' fire-protection sprinkler systems began to crack and leak. In 2021, Allied World National Assurance Company—which has paid more than $10 million to have the systems replaced—sued Nisus Corporation, the manufacturer of a product that allegedly degraded the pipes. According to Allied, Nisus falsely represented that its product was compatible with the pipe material. But

No. 24-30386

Allied's claims are time-barred under Louisiana law, so we affirm the district court's summary judgment in favor of Nisus.

## I.

In 2016, to facilitate its "Nicholson Gateway Development Project," Louisiana State University entered a public–private partnership formed "to design, build, finance, operate, and maintain new student residence halls and other amenities." Through a subsidiary, LSU leased the project site to Provident Group-Flagship Properties, LLC (Provident); upon completion of the project, LSU was to lease the facilities from Provident. Provident contracted RISE Tigers, LLC, to design and construct the buildings. RISE Tigers, in turn, hired The Lemoine Company, LLC (Lemoine) to serve as general contractor. Lemoine subcontracted with two companies to construct the project's seven buildings. Provident then purchased an insurance policy covering itself, the contractors, and the subcontractors. Provident also purchased an excess-liability insurance policy from Allied World National Assurance Company (Allied).

Provident contracted RISE Residential to serve as the post-construction facilities manager. Under the parties' contract, RISE Residential agreed to "supervise, direct, and control certain custodial, maintenance, operations, replacement and repair obligations with respect to the Property . . . as the agent of Provident[.]" RISE Residential also agreed to "keep and maintain the Property in good operating condition, order, and repair, and in connection therewith, . . . formulate and implement a written preventative maintenance program designed to efficiently and effectively maintain the condition of the Property."

Construction began in October 2016. During construction, a company hired by Lemoine's construction subcontractors installed fire-protection sprinkler systems that used chlorinated polyvinyl chloride (CPVC) pipes

2

manufactured by Spears Manufacturing Company (Spears). Spears's written materials warned against exposing its CPVC sprinkler systems to "incompatible substances, such as," *inter alia*, termiticides, insecticides, and fungicides, as exposure could "cause cracks or fractures . . . resulting in property damage due to leaks or flooding" and "requir[ing] partial or full system replacement." Elsewhere, Spears warned against exposing its systems to termiticides, insecticides, fungicides, and mold-remediation products "unless product labels state materials are compatible with CPVC."

After the sprinkler systems were installed, Lemoine's subcontractors hired Arrow Pest Control of Baton Rouge, Inc., to spray the buildings' wood framing with "Bora-Care with Mold-Care." Bora-Care is a termiticide, insecticide, and fungicide concentrate manufactured by Nisus Corporation. Mold-Care is a moldicide concentrate that may be used in combination with Bora-Care; it also is manufactured by Nisus. The Bora-Care product label provides instructions for mixing Bora-Care with Mold-Care and represents that "Bora-Care solutions may be used on all non-food contact surface cellulosic materials . . . and other non-cellulosic components found in structures."

In June 2018, the project reached substantial completion. That milestone triggered the start of a one-year warranty period for the sprinkler systems. During the warranty period, the systems leaked sporadically, and RISE Residential worked with Lemoine to have the leaks repaired. The systems continued to leak after the warranty period ended. The company that performed the post-warranty repairs invoiced RISE Residential, which issued payment out of a Provident account. RISE Residential thereafter submitted monthly reports to Provident that contained lists of such expenditures, along with the supporting invoices.

On November 20, 2019, RISE Residential's Marc Nichols, who served as the project buildings' general manager, sent an email to Vyron Bernard, RISE Tigers's construction project manager—copying Alana Savoie, RISE Residential's regional director, among others—to express Nichols's "growing concern[] of the number" of leaks "during a short period of time" as well as his hope that they could "find the root cause of the issue and then determine a resolution." Savoie forwarded Nichols's email to Courtney Gordon, RISE Residential's senior vice president, to let him know about the leak issue. Savoie explained that there were "cracks in the pipe [nowhere] near a joint" and that the piping failure "could turn into a nightmare" if caused by a "glue issue." Gordon replied that the team should keep updated incident reports on the leaks. According to one such incident report Nichols wrote, a leak reported on November 20 appeared to result from "an environmental stress fracture," and a second leak reported that day "seem[ing]ly confirmed our previous beliefs" that "there may be an issue with the glue that was used."

On December 11, 2019, Nichols sent an email to Bernard referencing a "meeting concerning the sprinkler leaks." Bernard replied that a section of damaged pipe had been given to Lemoine to be "tested by a lab to determine what contaminates may [have been] damaging the pipe." Bernard assured Nichols that RISE Tigers would "set up the meeting with [Lemoine] as soon as they [got] the lab results."

That same day, Dr. Duane Priddy of Plastic Failure Labs, the plastic expert hired by Lemoine, sent Lemoine a "memo update" suggesting that the pipe-cracking may "have been caused by over-spray of products" that were "used to treat wood surfaces" and that "contained antimicrobial chemicals added to inhibit mold." Five days later, Dr. Priddy informed Lemoine that he had "received preliminary data from the lab confirming that it was the Mold[-]Care ingredient" in the Bora-Care with Mold-Care

4

solution that had "degraded the CPVC pipe" and was "causing it to fail." On February 5, 2020, Dr. Priddy provided Lemoine a formal report on the root cause of the CPVC piping failure in the buildings. His report concluded that the cause of the failure was indeed "exposure of the CPVC piping to Mold[-]Care overspray during treatment of the wood surfaces." But RISE Residential never followed up with either Lemoine or RISE Tigers to learn of the lab results or about the promised meeting to discuss them.

In November 2020, Dr. Priddy issued another report to Lemoine on the root cause of the CPVC piping failure in the buildings. The report was based on the testing of four pipe samples,[1] and its conclusion was consistent with what Dr. Priddy had previously communicated to Lemoine. Later that month, LSU sent Provident and the RISE parent company a letter stating that LSU had "received notice of repetitive water leaks involving the [buildings'] fire sprinkler systems" that were likely caused by CPVC "exposure to antimicrobial or anticorrosion chemicals" and that necessitated "[r]eplacement or repair" of the systems. In March 2021, Allied received a notice of claim submitted on Lemoine's behalf seeking insurance coverage under Provident's excess policy for the cost of removing and replacing some of the buildings' sprinkler systems. In June 2021, RISE Residential, "as agent for" Provident, contracted Lemoine to perform that work. Allied represents that it has now reimbursed Provident more than $10 million for sprinkler-system replacement.

On July 23, 2021, Allied, as Provident's subrogee, sued Nisus in the Middle District of Louisiana, bringing Louisiana Products Liability Act,

_____

[1] According to Allied, "Lemoine determined that the analysis of a single pipe sample was insufficient for anyone to make a definitive conclusion that a [p]roject of this scale had a systemic problem," so "Lemoine requested Dr. Priddy conduct testing on additional samples from other buildings at the Project."

redhibition, and warranty claims.[2]  In October 2023, Nisus moved for summary judgment, arguing that Allied's claims were time-barred.  In June 2024, the district court granted Nisus's motion.  The court concluded that (1) one year before Allied filed suit, Provident itself did not have actual or constructive knowledge of the cause of the damage, (2) but by that point, RISE Residential had constructive knowledge of the cause, notwithstanding Nisus's alleged misrepresentations and failure to warn, and (3) RISE Residential's constructive knowledge was imputed to Provident.  *Allied World Nat'l Assurance Co. v. Nisus Corp.*, CV 21-00431-BAJ-EWD, 2024 WL 2834454, at *5–9 (M.D. La. June 4, 2024).  Allied timely appealed.

## II.

"We review a district court's grant of summary judgment *de novo*." *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 995 F.3d 384, 388 (5th Cir. 2021). "Summary judgment is appropriate where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting FED. R. CIV. P. 56(a)).  "We apply the same standard as the district court and view the evidence in the light most favorable to the nonmoving party." *Balboa Cap. Corp. v. Okoji Home Visits MHT, L.L.C.*, 111 F.4th 536, 546 (5th Cir. 2024).  "A genuine dispute of material fact exists if a reasonable jury could [return] a verdict for the nonmoving party." *Id.*

## III.

Louisiana law governs this diversity-jurisdiction case.  During the relevant timeframe, "Louisiana law provide[d] a one-year liberative prescription period for products-liability cases." *In re Taxotere*, 995 F.3d at

---

[2] Allied also sued Spears, but the district court dismissed those claims after Allied and Spears reached a settlement.

388 (citing LA. CIV. CODE art. 3492 (repealed 2024)).[3]   Generally, "prescription commences to run from the day injury or damage is sustained." LA. CIV. CODE art. 3492 (repealed 2024).   But "[u]nder Louisiana law, there is a firmly rooted equitable-tolling doctrine known as *contra non valentem agere non currit praescriptio*, which means '[n]o prescription runs against a person unable to bring an action.'" *In re Taxotere*, 995 F.3d at 390 (second alteration in original) (citation omitted).   "The doctrine tolls prescription only in . . . [certain] 'exceptional circumstances,'" two of which are relevant to this case:  (1) "where the cause of action is not known or reasonably knowable by the plaintiff, even though this ignorance is not induced by the defendant," and (2) "where the defendant has done some act effectually to prevent the plaintiff from availing himself of his cause of action." *Id.* (citation omitted).   The doctrine encapsulated in the former category is "often named the 'discovery rule.'" *Id.* at 391 (citation omitted).

Under the discovery rule, "[a]ctual knowledge is not required" for prescription to start running; "constructive notice suffices." *Id.* "Constructive knowledge or notice sufficient to commence the running of prescription requires more than a mere apprehension something might be wrong." *Chevron USA, Inc. v. Aker Mar., Inc.*, 604 F.3d 888, 894 (5th Cir. 2010) (alteration accepted) (citation omitted).   "But when a plaintiff suspects something is wrong, he must 'seek out those whom he believes may be responsible for the specific injury.'" *Id.* (quoting *Jordan v. Emp. Transfer Corp.*, 509 So. 2d 420, 423 (La. 1987)); *see also In re Taxotere*, 995 F.3d at 392 ("The duty to act requires an investigation of the injury.").   "When

_____

[3] In Louisiana, "limitations periods are often called 'prescriptions' or 'prescriptive periods.'" *Franklin v. Regions Bank*, 976 F.3d 443, 447 (5th Cir. 2020).   Under LA. CIV. CODE art. 3493.1, Louisiana now has a two-year prescription period for torts, but this new provision only applies to actions arising after July 1, 2024.   2024 La. Sess. Law Serv. Act 423 (H.B. 315); *see also Haygood v. Morrison*, 116 F.4th 439, 445 n.4 (5th Cir. 2024).

prescription begins to run depends on the reasonableness of a plaintiff's action or inaction." *Jordan*, 509 So. 2d at 423. "When a plaintiff acts reasonably to discover the cause of a problem, 'the prescriptive period does not begin to run until he has a reasonable basis to pursue a claim against a specific defendant.'" *Aker Mar.*, 604 F.3d at 894 (alterations accepted) (quoting *Jordan*, 509 So. 2d at 424). "Summary judgment is inappropriate where reasonable minds could differ as to the applicability of *contra non valentem*." *In re Taxotere*, 995 F.3d at 389.

Allied filed this lawsuit on July 23, 2021, so the ultimate question is whether prescription began to run on Allied's claims before July 23, 2020. We conclude that it had and that Allied's claims are therefore prescribed. Our analysis tracks that of the district court's well-reasoned opinion.

## A.

The first question is whether Allied's subrogor Provident had actual or constructive knowledge that triggered the running of prescription before July 23, 2020. Allied asserts that "Provident did not learn of the damage to the sprinkler system until it received notice from LSU on November 17, 2020." Nisus counters that RISE Residential's issuance of payments for post-warranty leak repairs out of a Provident operating account gave Provident sufficient "notice to investigate" by November 2019.

Nisus waves away the fact that "RISE Residential was invoiced approximately $5,000" for those repairs, compared to a "Total Controllable Expense budget" north of $2 million per year, by arguing that "[t]he commencement of prescription is not premised on the value of the repair costs." But it is far from clear that being charged the relatively small sum of $5,000 for repair work indisputably gave or should have given rise to even an apprehension on Provident's part that something was wrong. *See Aker Mar.*, 604 F.3d at 894. Therefore, we cannot say that Provident itself had actual or

constructive knowledge sufficient to trigger the running of prescription before July 23, 2020.

## B.

Our inquiry does not end there, though, because of the possibility that Provident's undisputed agent RISE Residential had knowledge that is properly imputed to Provident. The natural next question is thus whether RISE Residential had actual or constructive knowledge sufficient to trigger the running of prescription before July 23, 2020. The theme that repeats throughout Allied's briefing is that the multi-building sprinkler system was large and had shown relatively few leaks by November 2019. Allied points to the suggestion in Nichols's deposition testimony that "his concern[] with the number of leaks was simply a function of his background and previous experience at smaller projects." Allied also downplays Savoie's concern that the leak issue "could turn into a nightmare" by quoting her deposition testimony that she did not think it *was* a nightmare at the time. Allied adds the LSU corporate representative's statement that many "potential nightmares . . . turn out to be nothing." Finally, Allied argues that "RISE Residential had no reasonable basis to pursue a claim against a specific defendant" before July 23, 2020, because "RISE Residential had never encountered a glue issue or heard of environmental stress cracking before this Project," and because Nisus's own experts have challenged Dr. Priddy's testing methodology.

Neither Allied's attempt to downplay Nichols's and Savoie's emails nor RISE Residential's purported inexperience with glue issues and environmental stress cracking suffices to defeat summary judgment. Nichols and Savoie evinced clear concern in November 2019 that something could be seriously wrong with the sprinkler systems. Their suspicion triggered a duty to undertake a reasonable investigation of the issue and, at least, to keep

abreast of any ongoing investigations of which they were aware. *See In re Taxotere*, 995 F.3d at 391–92; *Aker Mar.*, 604 F.3d at 894; *Jordan*, 509 So. 2d at 423. To his credit, Nichols sent an email to RISE Tigers in December 2019 showing some investment on RISE Residential's part in uncovering the root cause of the pipe-cracking. And Nichols learned from RISE Tigers that Lemoine was having a section of pipe "tested by a lab to determine what contaminates may [have been] damaging" it. RISE Tigers also told Nichols that it would "set up [a] meeting with [Lemoine] as soon as [Lemoine got] the lab results."

Within a week, Dr. Priddy informed Lemoine that the lab results "confirm[ed]" Mold-Care as the cause of the pipe-cracking, and in February 2020, Dr. Priddy sent Lemoine a formal report with the same conclusion. Yet RISE Residential never followed up with RISE Tigers or Lemoine about the lab results or a meeting to discuss them. Inexplicably, RISE Residential neglected to do so even as it received 34 new reports of sprinkler-system leaks from December 11, 2019, the day it learned of the lab testing, through July 23, 2020. That puzzling inaction was unreasonable as a matter of law.

Citing Nisus's experts, Allied contends that RISE Residential would not have known the root cause of the leaks even if it had learned of Dr. Priddy's reports earlier because Dr. Priddy initially tested only one sample and used an allegedly "questionable and potentially unreliable" methodology. But "evidentiary confirmation of a cause" is a "level of certitude" that "is not a prerequisite to the commencement of prescription." *In re Taxotere*, 995 F.3d at 392 (quoting *Oil Ins. Ltd. v. Dow Chem. Co.*, 2007-0418, p. 9 (La. App. 1 Cir. 11/2/07), 977 So. 2d 18, 24, *writ denied*, 2007-2319 (La. 2/22/08), 976 So. 2d 1284). Here, it was enough that RISE Residential "through the exercise of reasonable diligence should have 'considered [Mold-Care] as a potential root cause of'" the pipe-cracking well before July 23, 2020. *Id.* at 393–94 (quoting *Oil Ins. Ltd.*, 977 So. 2d at 23.). "A

reasonable inquiry would have uncovered at least some information that linked [Mold-Care] to [the pipe-cracking]." *Id.* at 394. Based on this undisputed record, RISE Residential had constructive knowledge sufficient to trigger the running of prescription well before July 23, 2020.

## C.

Though the parties do not contest that RISE Residential was an agent of Provident, they vigorously contest the scope of the agency relationship.

"Notice or knowledge of an agent, while the agency or relationship exists and while the agent is acting within the scope of his authority, is notice and knowledge [of] his principal." *Cannata v. Bonner*, 2008-36, p. 4 (La. App. 3 Cir. 5/7/08), 982 So. 2d 968, 971; *see also Metro. Wholesale Supply, Inc. v. M/V Royal Rainbow*, 12 F.3d 58, 62 (5th Cir. 1994). Allied argues that RISE Residential was only a "limited agent" of Provident and that "any constructive knowledge that RISE Residential may have had" regarding the sprinkler-system leaks "cannot be imputed to Provident because that knowledge was outside the scope of RISE Residential's limited agency." Nisus counters that nothing in Provident and RISE Residential's Facilities Operation and Maintenance Agreement (FOMA) suggests that "the scope of RISE Residential's agency was in any way 'limited' and did not include the responsibilities to discover, repair, and report sprinkler leaks."

Allied's attempts to limit the scope of RISE Residential's agency fail. Allied quotes provisions of the FOMA that state that RISE Residential was not obligated to "cause, supervise and/or coordinate" either (a) "the construction and installation of any renovations, improvements, substantive repairs, or replacements of a capital nature," unless requested to do so by Provident, or (b) "the re-construction of a Facility due to a casualty or other similar event." But RISE Residential's lack of an open-ended duty related to capital improvements is beside the point; that fact simply does not speak to

whether RISE Residential's knowledge about the underlying problem could be imputed to Provident.

Allied also notes that since it filed this lawsuit, RISE Residential employees have maintained that RISE Residential had no responsibility to "investigate and determine the cause of the sprinkler-system leaks." And Allied asserts that Savoie "made [it] clear" that "a separate contract or amendment to the FOMA was required for [RISE Residential] to perform and assume duties relative the sprinkler-replacement project." But these mid-litigation self-exculpations, standing alone, are likewise unpersuasive.

Whatever the outer bounds of the agency relationship, RISE Residential had a duty under the FOMA to address leaks and keep Provident apprised of serious leak issues: RISE Residential expressly promised to "supervise, direct, and control certain custodial, maintenance, operations, replacement and repair obligations with respect to the Property as more particularly set forth [t]herein (the 'Facilities Manager Duties'), as the agent of [Provident]." RISE Residential agreed to perform those duties "in a manner reasonably calculated to . . . protect and preserve" the buildings, while acting in "good faith and exercising prudent commercial judgment." The FOMA's "Facilities Manager Duties" section provides that RISE Residential's core responsibilities included "[c]orrective" "[r]epair & replacement of building and site components." "Continuous leaks that [could] result in damage to facility or contents" were to be among the highest-priority work orders for RISE Residential to address. And RISE Residential was charged with coordinating annual tests of the buildings' sprinkler systems "by an independent vendor who [would] perform a comprehensive inspection of the system[s]" and recommend any necessary repairs and replacements.

In light of RISE Residential's broader responsibilities as Provident's facilities manager, we agree with the sentiment expressed by the district court:

> It defies belief that RISE Residential could be required to coordinate a "comprehensive inspection" of the sprinkler system, but, when it came to Lemoine's investigation into the sprinkler leaks, prompted by RISE Residential's own concern, RISE Residential was suddenly absolved of any responsibility or duty to learn of the results and communicate such results to Provident.

*Allied World Nat'l Assurance Co.*, 2024 WL 2834454, at *8. The district court properly imputed RISE Residential's constructive knowledge to Provident.

## D.

Finally, we address Allied's contention that there is a genuine factual dispute over whether Nisus prevented Allied from availing itself of its causes of action. *See In re Taxotere*, 995 F.3d at 390 (stating that the doctrine of *contra non valentem* tolls prescription "where the defendant has done some act effectually to prevent the plaintiff from availing himself of his cause of action" (citation omitted)). Allied alleges that Nisus's product label falsely represented that Bora-Care with Mold-Care was compatible with CPVC— and that Nisus failed to warn Provident that it was incompatible—despite Nisus's own failed compatibility test in 2005, customer complaints in 2017– 2020, three failed compatibility tests in 2018–2020, and an assertion of incompatibility by Spears in 2019. "Most importantly," Allied argues, in late January 2021, "Nisus misrepresented to Arrow [Pest Control] . . . that Bora-Care with Mold-Care [was] compatible with CPVC piping."

As discussed above, had RISE Residential acted diligently, it would have had a reasonable basis to pursue a claim against Nisus well before July 23, 2020. And Nisus neither said nor did anything to prevent Provident or

RISE Residential from timely pursuing a claim. The only alleged misrepresentations by Nisus that could have delayed Allied's filing of suit were in an email Nisus sent to Arrow Pest Control, and the Bora-Care label's statement that "Bora-Care solutions may be used on all non-food contact surface cellulosic materials . . . and other non-cellulosic components found in structures." But Nisus's email to Arrow Pest Control—sent not to Allied or Provident or RISE Residential, but rather to a company hired by companies hired by a company hired by a company hired by Provident—came more than a year after Dr. Priddy first identified Mold-Care as the cause of the pipe-cracking. And it came just ten days short of a year after Dr. Priddy's February 2020 formal report to Lemoine ascribing the leaks to Mold-Care. Allied presents no evidence from which a reasonable jury could conclude that Nisus's email to Arrow Pest Control delayed Allied's ability to file this suit timely.

Similarly, there is no evidence linking RISE Residential's inaction to Nisus's allegedly misleading product label. Had RISE Residential taken reasonable action, it would have learned of Dr. Priddy's contrary conclusion well before July 23, 2020. Then, "diligence [would have] required that [Mold-Care] be explored as a possible explanation," regardless of what Bora-Care's label said. *In re Taxotere*, 995 F.3d at 394. Diligence would have especially required such an exploration given Spears's warnings about exposing its CPVC sprinkler systems to termiticides, insecticides, fungicides, and mold-remediation products. In sum, Nisus did not prevent Allied from availing itself of its causes of action; "a reasonable inquiry would have led to the information needed." *Id.* at 395.

## IV.

The district court rightly granted summary judgment in favor of Nisus. RISE Residential had at least constructive knowledge—imputed to

No. 24-30386

Allied's subrogor Provident—that triggered the running of prescription well before July 23, 2020. And based on the record before us, Nisus did not prevent Allied from timely availing itself of its causes of action.

AFFIRMED.