STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

15-1148

JUSTISS OIL COMPANY, INC.

VERSUS

OIL COUNTRY TUBULAR CORPORATION, ET AL

**********
APPEAL FROM THE
THIRTYSIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, DOCKET NO. 09-1338 A
HONORABLE MARTHA ANN O'NEAL, DISTRICT JUDGE
**********

SYLVIA R. COOKS
JUDGE

**********

Court composed of Judges Sylvia R. Cooks, John D. Saunders, Elizabeth A. Pickett, John E. Conery and Kent D.Savoie.

AFFIRMED IN PART, REVERSED IN PART, RENDERED.

Conery, J. concurs in the result. Savoie, J., concurs in part, dissents in part with written reasons.

Robert E. Kerrigan
Isaac H. Ryan
Deutsch Kerrigan L.L.P.
725 Magazine Street
New Orleans, LA 70130
(504) 581-5141

Douglas K. Williams
Breazeale, Sachse & Wilson, L.L.P.
P.O. Box 3197
Baton Rouge, LA 70821-3197
(504) 619-1800

ATTORNEYS FOR DEFENDANT/APPELLANT
  Oil Country Tubular Corporation and North American Interpipe, Inc.

Jimmy R. Faircloth, Jr.
Barbara B. Melton
Christie C. Wood
Brook L. Villa
Faircloth, Melton & Sobel, L.L.C.
105 Yorktown Drive
Alexandria, LA  71303
(318) 619-7755

and

Donald R. Wilson
R. Joseph Wilson
Wilson & Wilson
P.O. Box 1346
Jena, LA  71342
(318) 992-2104

**ATTORNEYS FOR PLAINTIFF/APPELLEE**
  **Justiss Oil Company, Inc.**

**Cooks, Judge**

## FACTS AND PROCEDURAL HISTORY

Justiss Oil Company, Inc. (Justiss) (Plaintiff) and MidStates Petroleum Company, L.L.C. (MidStates) entered into an International Association of Drilling Contractors Model Turnkey Drilling Contract[1] for an oil well[2] in Beauregard Parish, Louisiana for the sum of $2,836,733.00. The contract specified the 15,000 foot deep well would have a bore hole lined with a 7 5/8 inch pipe casing to a depth of 12,500 feet. The remaining 2,500 feet would be drilled without casing (referred to in the industry as "open hole"). Drilling pipe reaching a bottom hole diameter of 6 ½ inches would be run inside the intermediate casing down to 12,500 feet. In preparation for drilling the well, Justiss purchased 12,500 feet of intermediate casing pipe from Oil Country Tubular Co. (Oil Country)(Defendant). The intermediate casing was manufactured by North American Interpipe, Inc. (NAI)(Defendant). Justiss purchased what is commonly referred to in the industry as "buttress thread" casing pipe with a burst pressure rating of 12,600 pounds per square inch ("psi").[3] Oil Country did not have enough LTC pipe on hand to string the entire depth needed but could provide Justiss with enough buttress thread casing pipe to complete its drilling project. Justiss preferred to use the same type of pipe for the entire string of casing to the 12,500 foot depth required and

---

[1]  In the oil drilling industry a "turnkey contract" is defined as "On a 'turnkey basis, the parties agree on a fixed sum of money that will be paid to the drilling contractor in return for his furnishing a drilling crew, drilling equipment and certain specified materials and services, to be due and payable only after the hole is drilled to contract depth . . . Manual of Oil & Gas Terms (6th Ed.), Williams and Myers, (Matthew Bender, 1984), p. 926.

[2]  The proposed well was identified as "Musser-Davis 34-1 well."

[3]  There are two types of casing pipe, buttress thread and LTC or "eight round," and each are distinguished by the threading on the end of the pipe. LTC has small threads, eight to an inch, each thread tapering to a point. Buttress thread has heavier or thicker threads, five to an inch, each one squared off instead of tapered.

therefore opted to purchase the buttress thread casing pipe. Oil Country represented to Justiss the intermediate casing pipe was "API certified pipe," meaning it met the standards required by the American Petroleum Institute for casing and tubing pipe to be used in oil drilling operations. Oil Country's owner, Mr. J.C. Gallet, represented to Justiss that this buttress thread pipe was fit for the use intended by Justiss as intermediate casing pipe. The pipe was rated as API 5CT, meaning the pipe would hold at least 10,000 psi for 5 seconds and has a burst pressure of 12,600 psi. North American stated in its invoices the pipe was certified API 5CT and provided mill certificates certifying each joint of pipe.

Both Justiss' and Defendants' experts agreed that this type of buttress thread pipe was appropriate for use as intermediate casing in the proposed Musser-Davis 34-1 well. Dr. Robert W. Nicholson, Phd. (Nicholson) was accepted as an expert witness in petroleum engineering with emphasis on design, planning and on-site management of drilling operations. He testified buttress thread pipe was developed in the 1950's as a more robust drilling pipe than the eight-round thread. According to this expert, buttress thread pipe has two important advantages, greater tensile strength and a higher collapse rating. He explained that with improved technology wells could be set at deeper depths. But to reach these depths safely, a pipe with greater tensile rating and greater collapse rating was needed. Buttress thread pipe was developed for these purposes and according to his testimony has proven to be "extremely useful" for deeper drilling. He further testified the API 5CT specification for buttress thread pipe is "very precise" as to how the threads are to be cut in order for the pipe to have the appropriate tensile strength and collapse rating. According to his expert testimony, if the threads are not manufactured properly the pipe can leak and/or it can pull apart. He also

testified the pipe purchased by Justiss was certified as API 5CT, which certifies to a purchaser that the pipe "has been manufactured, sampled, tested, and inspected in accordance with API 5CT." This informs the purchaser that this pipe has a particular burst rating, a certain tensile strength, a certain collapse rating, and a particular chemical composition indicating its strength and suitability for drilling a deep well like Musser-Davis 34-1. When experts tested a sampling of pipes from the same batch of pipe purchased by Justiss they found an abnormally high percent of the pipe was defective. In their opinion these defective pipes would leak and would not hold pressure to the certified level. Of the fourteen hundred fifty-seven joints of pipe tested two hundred two were rejected. Their finding showed almost fourteen percent of the batch tested was rejected as defective as opposed to the normal industry rate of two percent.

Justiss began its drilling operation for Musser-Davis 34-1 by drilling a hole in which it inserted a 10 7/8 inch surface casing pipe which commenced at the earthen surface of the proposed well down to a depth of 3400 feet. Next, the driller hired by Justiss began drilling a 12,500 foot bore hole which would accommodate the 7 5/8 inch intermediate casing pipe. Upon reaching a depth of 12,269 feet, Justiss inserted the intermediate casing pipe and then cemented the intermediate casing into the hole according to its normal operating procedures. At this time Justiss was not aware of defects in the intermediate casing pipe. While cementing the intermediate casing in the hole, Justiss repaired a hole in the surface casing so as to avoid any possibility of contaminating ground water by leakage of drilling fluid from such a hole in the surface casing. This was accomplished by inserting a diverter tool which diverted cement upward between the surface casing and intermediate casing which both filled the hole in the surface casing and added

3

stability. Defendant's expert agreed that once casing is cemented in the hole it cannot be removed.

In accordance with its planned procedures for drilling Musser-Davis 34-1, Justiss initiated pressure tests on the intermediate casing. The casing pipe has a burst pressure of 12,600 psi, meaning if it exceeds that pressure during drilling operations it will fail, creating a dangerous situation for workers and the well. The hydrostatic columns of drilling mud in the casing needed to safely drill this well created about 9,000 psi of pressure. Because the casing pipe could not hold sufficient pressure above this requirement the driller attempted to proceed using a lighter weight drilling mud hoping the combined lower pressure in the pipe would keep it from bursting or pulling apart. Using the lighter drilling mud posed risks in controlling the well and avoiding a blowout because upward pressure from salt water continually increases as drilling reaches ever deeper depths. Justiss proceeded with caution attempting to safely make use of the defective pipe. Justiss' five week effort to work around the defective pipe proved to be of no avail, and when conditions became too dangerous to continue, Justiss capped the well to safeguard its workers and the environment.

During the drilling operations, after the intermediate casing pipe was cemented in the hole it failed to hold pressure to the certified level. Justiss tested the casing to determine if it would test to 2,500 psi above the drilling mud pressure for a total pressure of 11,500 psi, leaving a margin of error of 1,100 psi before the pipe would fail. During this testing the pipe would not hold pressure above 1,020 psi. Under its turnkey contract with MidStates, Justiss was not compensated for this effort in failing to drill Musser-Davis 34-1 resulting in financial losses. Justiss

4

sued the manufacturer of the pipe, NAI, and Oil Country, from whom it purchased the pipe, for redhibition of the sale and damages.

The jury returned its verdict through responses to a special verdict form. It determined that Justiss proved by "a preponderance of the evidence that the [pipe] was defective." This finding of fact was not appealed by Defendants. Having answered this question in the affirmative, the jury proceeded as instructed to the next interrogatory indicating it found "by a preponderance of the evidence that the defendants are liable in a claim of redhibition to Justiss Oil Company[.]" Despite these determinations the jury did not then determine the statutory damages due Justiss as a result of the redhibitory defect in the casing pipe. Instead, as instructed by the jury form, the jury proceeded to question number three finding the redhibitory defect in the casing pipe did not "proximately cause any damages sustained by Justiss Oil Company at the Musser-Davis 34-1 well[.]" Proceeding on to question four, the jury found "Justiss Oil Company's negligence proximately contribute[d] to its own damages sustained at the Musser-Davis 34-1 well[.]" Having made this finding, the jury then assigned ten per cent (10%) fault to Oil Country and ninety per cent (90%) fault to Justiss. Finally, the jury awarded $250,000 in damages as fair and reasonable compensation to Justiss. This sum was reduced by the 90% fault assigned to Justiss by the jury. In its reason for judgment the trial court found the jury form was "confusing and resulted in a contradictory and nonsensical verdict."

Justiss filed a Motion for Judgment Notwithstanding the Verdict (JNOV) which was granted by the trial court. Defendants also filed a Motion for JNOV which was subsequently withdrawn, and both parties represented to the trial court a new trial would not be in any party's best interest. The trial court set aside the

5

judgment rendered in accord with the jury findings and entered a new judgment in favor of Justiss. The trial court found Defendants liable in solido, and awarded Justiss the return of the purchase price, $391,050.20; the costs of repair, $1,165,450.43, which included Justiss' expenditures over a period of five weeks incurred while attempting to remedy the problem caused by the defective pipe; plus interest and court costs. The trial court also awarded additional consequential damages totaling $2,836,733.00, which sum represented Justiss' loss of profit incurred as a result of the inability to complete the turnkey project. The trial judge then reduced the award for consequential damages by 90% based on the jury's allocation of fault. After further briefing and oral argument the trial court additionally awarded Justiss expert witness fees totaling $56,281.94; special costs in the amount of $21,818.42; and attorney fees and expenses totaling $208,337.00 plus all court costs.

Defendants appealed the trial court judgment. Justiss answered the appeal asserting the trial court erred in applying comparative fault to reduce the award of consequential damages against the manufacturer and seller in redhibition. Justiss seeks an award for the full amount of consequential damages without reduction, and seeks an award of attorneys' fees for this appeal. Initially, Justiss asserted that in all other respects the JNOV is correct. However, it filed a supplemental brief on appeal in which it acknowledges an error in calculation of the damages awarded by the trial court which would improperly result in a double recovery of the purchase price of the defective pipe. The trial court awarded as damages the return of the purchase price and also awarded as consequential damages the lost profits which it found to be equal to the total contract price. The total contract price includes the purchase price of the defective pipe, thus resulting in double recovery of the

6

purchase price. Justiss acknowledges that Defendants are correct in pointing out this error to this court and therefore amends its request for relief to correct this error in the trial court's award.

## LEGAL ANALYSIS

Oil Country and NAI (Defendants) assert five assignments of error:

1. The district court failed to properly instruct the jury to cease deliberation after they determined that defects in the casing were not the proximate cause of damages to Justiss.

2. The district court failed to give any effect to the jury's verdict that the NAI casing was not the proximate cause of Justiss' damages.

3. The district court erred in granting a JNOV on the amount of damages.

4. The district court erred in failing to reduce [all of] Justiss' damages by the 90% fault found by the jury.

5. The district court erred in awarding attorney's fees to Justiss.

**Causation**

Plaintiff and Defendants present opposing theories as to which body of law should apply in determining damages here—contract or tort. Defendants assert, and the trial court found, that Louisiana Civil Code Article 2323, comparative fault, is applicable to contracts. As discussed later herein, we find it is only applicable to torts. Under contract law, applicable in this case, "an obligor is liable for the damages caused by his failure to perform a conventional obligation." La. Civ.Code art. 1994. The obligor's damages "are limited to only those damages 'caused by' the redhibitory defect, and not those damages attributable to other causes. [Id.]" As the federal court explained in *Hollybrook Cottonseed Processing v. Carver, Inc.*, 2011 WL. 2214936, p. 3 (W.D. La. 6/6/11):

> [W]hile comparative fault is inapplicable to Plaintiff's redhibition claim, failure to mitigate and questions of causation remain and may serve to limit the extent of damages attributable to any redhibitory defect and therefore recoverable by the Plaintiff.

Before we discuss the inapplicability of La. Civ.Code art. 2323 to contracts we must decide whether the trial judge erred in granting the JNOV reversing the jury's factual finding that the defective pipe was not the proximate cause of Plaintiff's damages. The trial court did not disturb the jury's factual findings regarding the existence of a redhibitory defect, and our review of the record supports that finding which we will address later.

Defendants complain that the trial judge erred in granting the JNOV because the jury correctly found Plaintiff failed to prove the defective intermediate pipe was a proximate cause of the loss sustained for several reasons. First, Defendants assert the intermediate pipe had a hole, Plaintiff put the hole in the pipe, this hole at the top was the problem as it made it impossible to remove the pipe and thereby afford defendants an opportunity to exchange the defective pipe. This, says Defendants, was the sole cause precipitated entirely from Plaintiff's conduct. Second, Defendants assert the well was a dry hole after all and any failure on its part did not play a role in Plaintiff's loss. Third, Defendants suggest Justiss was solely at fault because it used the wrong type of pipe.

We find the trial judge did not manifestly err in reversing the jury verdict, finding it was internally inconsistent and evidenced the jury's confusion. The trial judge noted the verdict was inconsistent on its face because the jury found the defective pipe was not the proximate cause of Plaintiff's loss; yet also found Justiss 90% contributorily negligent and Defendants 10% negligent.

8

We agree with the trial judge's factual findings on the issue of causation for several reasons. First, the record evidence does not show the *intermediate pipe* had a hole in it when placed in the bore hole. The evidence shows there was a hole in *the surface casing* at the time it was placed in the bore hole. The evidence also shows this hole in the surface casing had no effect on the problems presented by the defective intermediate pipe. Additionally, the record evidence shows Plaintiff was not wrong in cementing the surface pipe and intermediate pipe in the bore hole which occurred before Plaintiff had any idea that the intermediate pipe was defective. Second, the manufacturer cannot complain that Plaintiff's decision, though reasonable, denied it an opportunity to exchange the intermediate pipe because the law does not afford that right to it. Only the seller has that right, but in this case its argument fails too, because: 1) when the Plaintiff first realized the intermediate pipe was defective the opportunity to pull the pipe had already expired; and 2) in this case the seller has not appealed the trial court's finding holding it solidarily liable for the whole loss. We recognize that the obligation of a good faith seller is different from that of a bad faith seller in redhibitory defect cases, i.e., a good faith seller must be given the opportunity to replace the defective pipe whenever possible and can only be cast in judgment for the return of the purchase price and expenses. The law in addition affords a good faith seller a cause of action against the manufacturer for all damages due to the purchaser. In this case, although the seller filed a third party demand it is represented on appeal by the same lawyers as the manufacturer; and, for whatever reason, the seller and manufacturer decided to speak as one without assigning separate error. The seller did not seek to advance on appeal other defenses or claims solely granted to it.

Third, the evidence, if presented at all, is wantonly deficient in proving an alleged dry hole existed at the deeper depth. The only discussion in the record in support of that notion is Defendants' expert's hypothesis and speculation, based only on the amount of mud which began flowing at the time Plaintiff decided the excessive flow indicated the situation had become too dangerous to continue with the lighter weight mud especially considering it knew by that time the defective pipe could not hold sufficient pressure. Defendants assert that Mr. J.F. Justiss, III (Mr. Justiss) admitted the well could not be completed because of the alleged hole at 13,569 feet. A review of Mr. Justiss' testimony at trial makes a very different showing. It is true he, too, engaged in supposition at his deposition to this effect, but upon a thorough examination of the evidence including rig logs, on-site well studies, and all available data, he reached a different conclusion at trial, as did Dr. Nicholson, Plaintiff's expert. Both Mr. Justiss and Dr. Nicholson explained at trial why many in the industry would jump to this initial conclusion before reasoning from the data—a jump viewed as reasonable by defendant's expert Dr. Gary Wooley, Phd. (Dr. Wooley). But Mr. Justiss and Dr. Nicholson presented data gathered on the rig, *which evidence is not disputed by defendants*, to support their in-court testimony that it was not a hole in the formation that caused them to shut down the drilling operation. Dr. Nicholson explained that the evidence shows no indication of such an alleged hole in the formation. He pointed out that the evidence shows this was a "solid, competent" formation, so much so that the well was perfectly vertical all the way down. They explained that: (1) the defective pipe could not hold nearly enough pressure; (2) the pipe had been leaking at multiple stages of drilling beginning at 3,500 feet; (3) the defective pipe made it impossible to use a heavy enough drilling mud to safely proceed against increased

10

pressures pushing upward at deeper depths; (4) they were unable to keep the leaks plugged as they slowly pushed forward; and (5) persistent erosion of the metal pipe by abrasives in the drilling mud as it leaked through the defective collars, all taken together points to the reason for the sudden loss of mud when they reached 13,569 feet. Dr. Nicholson explained that because this was a solid vertical formation, and because they were getting circulation at 13,569 feet, he concurred with the rig man's conclusion that the mud was escaping at about 8,000 feet where a serious problem had previously occurred, which Justiss had tried to remedy. Under these circumstances known to Justiss when it experienced the sudden increase of mud loss it felt it was unsafe to attempt to proceed any further as all these factors too strongly indicated they could not control a blowout. In Dr. Nicholson's words "they were losing control of the well." At this point *Justiss, having informed defendants of the problems being caused by the defective pipe, offered them the opportunity to continue to drill the well themselves and/or to come to the well site and determine for themselves the cause of the excessive mud loss at 13,569 feet. Both Defendants declined to do either despite the fact that Defendant NAI had already hired Dr. Wooley as a consultant to address the situation.* Dr. Wooley admitted to knowing several techniques to investigate the cause of this problem but *he employed none of them.* Instead, he faults Justiss for failing to do so. But the burden to prove that some cause other than the defective pipe was the reason the well could not be successfully completed was on Defendants and they utterly failed to carry that burden. *Rey v. Cuccia*, 298 So.2d 840 (La. 1974) and *Tucker v. Petroleum Helicopters*, 08-1019 (La.App. 4 Cir. 3/23/09), 9 So.3d 966, *writ denied* 09-901 (La. 6/19/09), 10 So.3d 736.

Plaintiff put forth convincing expert evidence and the testimony of lay witnesses directly involved with drilling the well, who presented facts establishing the failure of the intermediate pipe evidenced by the inability of the pipe to hold sufficient pressure, and evidenced by the loss of drilling mud at depths well above the depth at which the increased loss of mud occurred. Plaintiff's evidence left no doubt that the pipe was defective and *Defendants do not assert that the pipe was not defective*.

Fourth, there is no basis in the record for the jury award of $250,000. The trial judge challenged Defendants to provide a basis for such an award but they could not do so. The trial judge pointed out the only basis for this figure was defense counsel's suggestion in closing argument. The record shows that the value of the pipe alone (the purchase price) exceeded this amount.

Fifth, there is no legal basis for ninety (90) percent versus ten (10) percent as we will discuss herein. And sixth, the evidence of record shows that this type of pipe was developed with advantages for use in drilling deeper wells such as Musser-Davis 34-1. Moreover, Defendants knew that Justiss was going to use the pipe for drilling a well at this depth and certified that the pipe was fit for such use.

Louisiana Code of Civil Procedure Article 1811 (F) provides a motion for JNOV "may be granted on the issue of liability or on the issue of damages or both." In *Dubois v. Armstrong*, 15-345 pp 5-6 (La.App. 3 Cir. 2/10/16), 186 So. 3d 305, 311, *writ denied*, 2016-0451 (La. 4/22/16), 191 So.3d 1045, this court explained the basis for granting a JNOV and the standard of review on appeal:

> In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so

> strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated.

*Anderson v. New Orleans Pub. Serv., Inc.,* 583 So.2d 829, 832 (La.1991).

> "The standard of review for a JNOV on appeal is a two part inquiry." *Davis v. Wal–Mart Stores, Inc.,* 00–445, p. 5 (La.11/28/00), 774 So.2d 84, 89. "After determining that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review." *Id.*

For the reasons stated above we find the trial judge did not manifestly err in granting the JNOV and reversing the jury finding on causation.

**Comparative fault not applicable to contracts.**

Plaintiff agrees with the trial court's JNOV, except Justiss argues the trial judge committed two legal errors. First, the judge applied the wrong theory of recovery in ultimately apportioning the consequential damage award which it insists rest entirely on contract law. Justiss argues that the assessment of Louisiana Civil Code Article 2323[4] comparative fault is applicable only in cases rooted in tort

---

[4]    Louisiana Civil Code Article 2323 is found in Book III, Title V, Chapter 3, "Of Offenses and Quasi Offenses."    This placement in the Code strongly signifies its application to tort law.  Contract law is found in Title IV of Book III.  *Hanover Ins. Co. v. Plaquemines Parish* Government, 2015 WL 4167745, p. 6 (E.D. La. July 9, 2015).

> A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.

13

and not those involving the relationship and obligations of contracting parties. Second, all parties agree the trial judge granted the purchase price of the pipe twice, and that was wrong.

We recognize that the Louisiana State Supreme Court has not ruled squarely on this question, and we note our courts of appeal are split on the issue. *See Aucoin v. Southern Quality Homes, LLC*, 07-1014 (La. 2/26/08), 984 So.2d 685. The first and second circuits have held La. Civ.Code art. 2323 is applicable to actions in redhibition. *Petroleum Rental Tools v. Hal Oil & Gas Co., Inc.*, 95, 1820 (La.App. 1 Cir. 8/22/97), 701 So.2d 213, *writ dismissed*, 97-3088 (La. 2/10/98), 706 So.2d 982 and *Hampton v. Cappaert Manufactured Housing, Inc.*, 36,773 (La.App. 2 Cir. 1/29/03), 839 So.2d 363. The fourth circuit has held La. Civ.Code art. 2323 applies only to actions in tort, and does not apply to an action in redhibition because such actions are based on the law of contracts. *Touro Infirmary v. Sizeler Architects*, 04-634 (La.App. 4 Cir. 3/23/05), 900 So.2d 200, *writs denied*, 04-2114 (La. 5/6/05), 901 So.2d 1093 and 05-1315 (La. 1/13/06), 920 So.2d 232. The federal courts in Louisiana have also split on the issue, some making their ruling without much analysis. Two decisions in the Louisiana federal courts are instructive and persuasive on the subject, and we think their reasoning, like the fourth circuit's, is sound. In *Hollybrook Cottonseed Processing, LLC v.*

---

B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.

C. Notwithstanding the provisions of Paragraphs A and B, if a person suffers injury, death, or loss as a result partly of his own negligence and partly as a result of the fault of an intentional tortfeasor, his claim for recovery of damages shall not be reduced.

Louisiana Civil Code art. 2323.

*Carver, Inc.*, 2011 WL 2214936 (W.D. La. 6/6/11), the federal court, recognizing the split among the state courts of appeal, held that the provisions on comparative fault apply only in tort actions. In a more recent case, the federal district court in Louisiana engaged in a more thorough analysis and concluded the Louisiana Supreme Court would likely hold that La. Civ.Code art. 2323 applies only to tort claims. It held comparative fault is not available as a defense to a redhibition claim. We quote that opinion at length because it presents a thorough and well-reasoned analysis of Louisiana law and jurisprudence which leads us to the same conclusion.

> In *Dumas v. State ex rel. Department of Culture, Recreation & Tourism,* [02-563 (La. 10/15/02), 828 So.2d 530] the Louisiana Supreme Court was asked to decide whether comparative fault principles applied in the context of a tort case. While the facts of *Dumas* are not applicable to this case, the Supreme Court's discussion of the 1996 revision is helpful.

> The Supreme Court's description of the 1996 amendment to article 2323 is rife with references to tort law. In fact, the Court describes the amendment's purpose as "to abolish solidary liability among non-intentional *tortfeasors* and to place Louisiana in a pure comparative fault system." [ (emphasis added) Id. at 535] The Court further characterizes the amendments as "effect[ing] a total shift in *tort* policy." [ (emphasis added) Id. at 538] The opinion consistently references the amendments as revising Louisiana's *tort* law but makes no reference to the amendments altering other theories of recovery. *Dumas's* consistent reference to the 1996 amendments as changing *tort* law is persuasive. So too is the fact that, as far as the Court can tell, no Louisiana court has applied comparative fault principles to a breach of contract claim.

> The Court, finding that Louisiana case law *sic*[does] not support the application of comparative fault to contract claims, finds greater support in the very structure of the Louisiana Civil Code. Unlike statutes enacted in common law jurisdictions, the articles of a civil code are carefully organized according to their subject matter. [citations omitted] The Louisiana Supreme Court has long held that civil code articles should be construed with regard to their subject matter. [*Compare Citizens & Taxpayers of De Soto Parish v. Williams*, 21 So. 647, 654 (La.1897) with *Pociask v. Moseley*, 13-262

15

(La. 6/28/13), 122 So. 3d 533, 540.] It is, therefore, helpful to consider article 2323's placement within the Civil Code.

Article 2323 is found in Title V of Book III of the Civil Code, dealing with obligations that arise without agreement. More specifically, it is located in Chapter 3, which contains Louisiana's tort law. Contract law, however, is found in Title IV of Book III. This, of course, suggests that article 2323 was intended to apply to tort law only.

A closer examination of the Code further supports this conclusion. Title IV of Book III contains specific rules governing the calculation of damages in contract cases. [La. Civ.Code arts. 1994-2004.] These provisions, among other things, allow a court to reduce the damages owed to a party damaged by another's breach of contract where the obligee's own negligence has contributed to his damages. [La. Civ.Code 2003.] The fact that the contracts section of the Code contains its own set of rules regarding damages also counsels against importing a tort article into contract cases.

It is a provision found in Title III of Book III, however, that most strongly counsels against the application of comparative fault in contract cases. Article 1804 provides:

> Among solidary obligors, each is liable for his virile portion. If the obligation arises from a contract or quasi-contract, virile portions are equal in the absence of agreement or judgment to the contrary. If the obligation arises from an offense or quasi-offense, a virile portion is proportionate to the fault of each obligor.

This article, unsurprisingly found in the general obligations provisions, specifically provides that damages are allocated in one manner among co-obligors to a contract and in a different manner among co-obligors to an offense or quasi-offense. Indeed, the comments to the article explicitly state that the allocation of damages "depend[s] on the source of the obligation." [La. Civ.Code art. 1804 cmt. (b).] In light of the distinction made in article 1804, it seems clear that the Legislature intended to create separate legal regimes governing the allocation of damages in contract and tort actions. Because the Louisiana Legislature has not altered either article 1804 or the damages articles in the section of the code dedicated to conventional obligations, the Court concludes that the Louisiana Supreme Court would likely hold that article 2323 applies to tort claims only.

*Hanover Ins. Co. v. Plaquemines Parish Gov't.*, 2015 WL 4167745, at 5–6

(E.D. La. July 9, 2015).

16

We find this reasoning sound and agree with this analysis of our law on torts and contracts. We therefore hold that comparative fault, as provided in La. Civ.Code art. 2323, does not apply to an action in redhibition. This is especially clear in redhibitory actions against a manufacturer given that under Louisiana law they are "conclusively presumed" to know of the defect. *Chevron USA, Inc. v. Aker Mar., Inc.*, 604 F.3d 888, 899 (5th Cir.2010).

**Redhibition.**

The jury, and the trial court in its granting JNOV, both concluded that Justiss proved a redhibitory defect in the casing pipe. This finding is well supported by the record and defendants do not dispute this finding on appeal. "The purpose of the redhibition action in Louisiana, as was the case in Roman law, has been to restore the *status quo.*" *Young v. Ford Motor Company*, 595 So.2d 1123, 1127 (La.1992).

> "[T]he purpose of awarding attorney's fees and expenses ... in redhibition cases is 'to restore the purchaser, as much as possible, to the condition he enjoyed prior to the sale.' " *Fontenot v. F. Hollier & Sons*, 478 So.2d 1379, 1389–90 (La. Ct. App. 1985) (quoting *Alexander v. Burroughs Corp.*, 359 So.2d 607, 610 (La. 1978)); *see also Young v. Ford Motor Co.*, 595 So.2d 1123, 1127 (La. 1992) ("**The purpose of the redhibition action in Louisiana ... has been to restore the status quo**.").

*Hollybrook Cottonseed Processing, L.L.C., v. Am. Guarantee & Liab. Ins. Co.*, 15-31090, 2016 WL 6541585 p. 2 (5th Cir. 11/ 3/16) (emphasis added).

The buyer is entitled to rescind the sale solely by reason of the redhibitory defect. La. Civ.Code art. 2520. Recovery based on redhibitory defects is not fault based, but arises from the seller/manufacturer's warranty of the thing sold. The buyer does not have the burden to prove some specific cause of the defect, nor is he required to negate other conceivable causes for the defective performance of the

17

object. *Young*, 595 So.2d 1123. Thus, the jury, and the trial court in its ruling granting JNOV, erred as a matter of law in apportioning fault regarding Justiss' redhibition claim, and in failing to award Justiss the damages mandated by the Louisiana Civil Code, having found Justiss met its burden to prove a redhibitory defect that rendered the pipe useless for its intended purpose.

The jury likely committed this error because of the fundamentally flawed interrogatories. Rather than directing the jury to award the statutory damages to which Justiss was entitled, the jury form directed the jury to assess degrees of fault as to Justiss, Oil Country, and NAI. This was a fundamental error in the jury instructions. Manufacturers of defective goods are deemed to have sold their goods in bad faith, and, under Louisiana redhibition law, are liable for: "the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees." La. Civ.Code Art. 2545.[5]

In *Aucoin v. South Quality Homes, LLC*, 07-1014, pp 6–11 (La. 2/26/08), 984 So.2d 685, 690–93, (emphasis added) the Louisiana state supreme court provided an instructive review of our law on redhibition:

> The statutory law relative to redhibition is contained in Title VII of the Louisiana Civil Code governing 'Sale.' La. C.C. art. 2520 states the warranty against redhibitory defects as follows:
>
> > The seller warrants the buyer against redhibitory defects, or vices, in the thing sold.

---

[5]   We note that the seller in this case, Oil Country, filed a third party action against the manufacturer in the court below. As the seller, Oil Country is not liable for the consequential damages which are due by the manufacturer unless it acted in bad faith in selling the defective pipe. The trial court held Oil Country and NAI liable in solido for all damages. Oil Country has not attacked the in solido finding of the trial court and we therefore cannot address that issue in this appeal.

A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. *The existence of such a defect gives a buyer the right to obtain rescission of the sale. . .*

La. C.C. art. 2530 provides in pertinent part that '[t]he warranty against redhibitory defects covers only defects that exist at the time of delivery.'

The extent of a seller's liability to a buyer for breaching this warranty depends on whether the seller knew, or did not know, of the defect. La. C.C. art. 2531 provides:

A seller who did not know that the thing he sold had a defect is only bound to repair, remedy, or correct the defect. If he is unable or fails so to do, he is then bound to return the price to the buyer with interest from the time it was paid, and to reimburse him for the reasonable expenses occasioned by the sale, as well as those incurred for the preservation of the thing, less the credit to which the seller is entitled if the use made of the thing, or the fruits it has yielded, were of some value to the buyer.

A seller who is held liable for a redhibitory defect has an action against the manufacturer of the defective thing, if the defect existed at the time the thing was delivered by the manufacturer to the seller, for any loss the seller sustained because of the redhibition. *Any contractual provision that attempts to limit, diminish or prevent such recovery by a seller against the manufacturer shall have no effect.*

On the other hand, the liability of a seller who knows of the defect is greater:

*A seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees. If the use made of the thing, or the fruits it might have yielded, were of some value to the buyer, such a seller may be allowed credit for such use or fruits.*

19

*A seller is deemed to know that the thing he sells has a redhibitory defect when he is a manufacturer of that thing.*

La. C.C. art. 2545.

In *Young v. Ford Motor Co., Inc.,* 595 So.2d 1123 (La.1992), we explained the Roman origins of the redhibitory action and that its purpose was to protect buyers from latent defects undisclosed by corrupt dealers. "This important aspect of our current law on sales (i.e., this system of implied warranty against latent defects and vices) was fully incorporated into Louisiana law." *Id.* (*See e.g.,* Louisiana Civil Code of 1808, Art. 66 and Art. 71) "The purpose of the redhibition action in Louisiana, as was the case in Roman law, has been to restore the *status quo.*" *Id.* (Citing Floyd W. Lewis, Comment, *Warranty of Quality in Louisiana: Extent of Recovery under the Implied–In–Law Warranty,* 23 Tul. L.Rev. 130, 131 (1948); *Savoie v. Snell,* 213 La. 823, 35 So.2d 745, 746 (1948). "The seller in good faith had only to restore the purchase price paid and any expenses incurred (Article 2509, La. Civil Code of 1825), while the seller in bad faith was also liable in damages. Article 2523, La. Civil Code of 1825)." *Id. Thus, an action in redhibition entitles the buyer to annul the sale and recover the purchase price, rather than being limited to recovering the cost of curing any such substantial defects. Rey v. Cuccia,* 298 So.2d 840 (La.1974); *Prince v. Paretti Pontiac Co., Inc.,* 281 So.2d 112 (La.1973).

Although the code articles on redhibition appear to only allow a suit by a buyer against a "seller" for redhibitory defects, this Court held in *Media Production Consultants, Inc. v. Mercedes–Benz of North America, Inc.,* 262 La. 80, 262 So.2d 377 (1972), that the buyer could recover directly from the manufacturer for breach of warranty, despite the fact that there was no privity of contract between them. In *Media Production,* the Court stated:

> Louisiana has aligned itself with the consumer-protection rule, by allowing a consumer without privity to recover, whether the suit be strictly in tort or upon implied warranty. *Marine Ins. Co. v. Strecker,* 234 La. 522, 100 So.2d 493 (1958); *LeBlanc v. Louisiana Coco Cola Bottling Co.,* 221 La. 919, 60 So.2d 873 (1952).
>
> We see no reason why the rule should not apply to the pecuniary loss resulting from the purchase of a new automobile that proves unfit for use because of latent defects. The pecuniary loss resulting from an unusable vehicle is recoverable when there is an Express warranty without privity. [Cites omitted.] Although there is a split of authority on the question, we find no adequate reason

20

for not applying the same rule and allowing recovery when there is an implied warranty without privity. [Cites omitted.]

262 So.2d at 380–81.

After this analysis, the Court held "that Mercedes–Benz of North America, Inc. [the manufacturer], is solidarily liable with [the seller] for the price of the automobile and other allowable expenses." *Id.*

Two years later, in *Rey v. Cuccia, supra,* this Court relied on *Media Productions* to hold the manufacturer of a trailer solidarily liable with the seller for a redhibitory defect which existed at the time the manufacturer sold the trailer to the seller. *See also Womack and Adcock v. 3M Business Products Sales, Inc.,* 316 So.2d 795 (La.App. 1 Cir.1975) (holding that "since the now famous case of *Media Pro.* ..., the buyer's action for breach of implied warranty has been extended to all sellers in the chain of sales back to the primary manufacturer"). The Court in *Rey* held that "[t]he consumer's action is enforceable against the manufacturer at the same time and at least within the same year following the sale to the consumer, Article 2534, as it is enforceable against the seller." 298 So.2d at 845. The Court further held that because the manufacturer is presumed to know of defects, the one-year limitation of Article 2534 does not apply and the consumer may institute the action to recover for the redhibitory defect within the year following his discovery of it. *Id.* (Citing La. C.C. art. 2546).

Although *Media Production* and *Rey* held the manufacturer and seller were solidarily liable for the defects at issue, we need not reach the correctness of that issue, as we find that the manufacturer is independently liable under those cases for redhibitory defects that existed at the time of delivery to the seller.

Under La. C.C. art. 2520, the seller warrants the product he sells to be free of redhibitory defects, and under La. C.C. art. 2531, the seller is liable to the buyer even for redhibitory defects he was not aware of, including those that were the fault of the manufacturer. In such a case, *the seller is responsible for correcting the defect, or, if he is unable to do so, he must return the purchase price with interest, plus reimburse the buyer for his reasonable expenses; however, he has an action against the manufacturer for any defects which "existed at the time the thing was delivered by the manufacturer to the seller."* La. C.C. art. 2531. On the other hand, while a buyer may sue a manufacturer directly for redhibitory defects, the manufacturer is liable but only for defects "resulting from the original manufacture" of the product. *Rey v. Cuccia, supra* at 845.

Thus, whether the manufacturer is solidarily liable with the seller for redhibitory defects is immaterial in this case, as the manufacturer is directly liable for redhibitory defects resulting from the original manufacture of the product.

Defendants assert that Justiss cannot recover damages because it failed to afford either of the Defendants the opportunity to cure the defect by replacing the defective casing pipe with good pipe. First, Justiss was under no such duty as to the manufacturer of the pipe, and in this case, under no such duty to the seller. Second, the expert evidence makes it clear that Justiss could not remove the casing pipe after it was cemented in the well bore hole. The expert evidence clearly shows that Justiss was acting reasonably and within normal drilling procedures when it elected to cement the casing in place before learning the pipe was defective.

> The degree of the seller's liability varies according to whether the seller knew of the defect. If he did not know of the defect, the seller must have an opportunity to cure the defect, either through repair or replacement. *Id.* arts. 2522 & 2531. *If the seller cannot cure the defect, the buyer is entitled to rescission and the reasonable expenses occasioned by the sale. Id. The law is more demanding of the seller who knows of the defect. The seller is entitled to no opportunity to cure, and the seller in bad faith must pay for damages, plus reasonable attorney fees. Id.* arts. 2522 & 2545. ***Manufacturers are conclusively presumed** to know of defects in their products, Id. art. 2545 cmt. (d), and consequently, a manufacturer of a defective product is liable for a buyer's reasonable attorney fees.*

*Chevron*, 604 F.3d at 899 (emphasis added).

Defendants also maintain that Justiss' recovery for redhibitory defects is dependent upon proof of causation with an apportioning of responsibility for Justiss' losses. Again, Defendants misconstrue the law on redhibition.

> In a suit for redhibition, the plaintiff must prove: 1) the seller sold the thing to him and it is either absolutely useless for its intended purpose or its use is so inconvenient or imperfect that, judged by the reasonable person standard, had he known of the defect, he would never have purchased it; 2) the thing contained a nonapparent defect

22

> at the time of sale; and 3) the seller was given an opportunity to repair the defect. *Vincent v. Hyundai Corp.,* 633 So.2d 240, 243 (La.App. 1 Cir.1993), *writ denied,* 93–3118 (La.2/11/94), 634 So.2d 832.

*Blair v. Bad Boy Inc.*, 48,953 pp. 5–7 (La.App. 2 Cir. 4/9/14), 137 So.3d 1223, 1227–28.

In this case, it is undisputed Country Oil sold defective pipe manufactured by NAI to Justiss, and the pipe could not perform to the standards it was certified to meet. The evidence further demonstrates: 1) the defect in the casing pipe rendered it useless for Justiss' purpose; 2) the pipe contained a non-apparent defect at the time of the sale; 3) it was not possible to give Country Oil an opportunity to cure the defect; and 4) the defect could only be cured by providing new pipe but this option was not a viable option in this case. Additionally, NAI, as manufacturer of the defective pipe, was not entitled to an opportunity to cure the defect. The finding of a redhibitory defect in the pipe voids the sale *ab initio* and hence the imposition of damages to return the buyer to the *status quo*.

Justiss' efforts over an almost five week period are well documented as are the costs incurred during these attempts to mitigate its losses. Before ever reaching Defendant's alleged hole in the ground, Justiss spent over four weeks making every reasonable effort to proceed with drilling the well while having to use defective pipe cemented in the ground. Justiss made expensive and professional attempts to remediate the leaky pipe from its discovery of the problem at 3,500 feet, on down to 8,000 feet where it encountered more problems with the pipe leaking, and continuing all the way down to 13,569 feet when the situation became too dangerous to proceed. At 3,500 feet down the pipe was pressure-tested as the law requires. The defective pipe utterly failed to hold pressure to the minimum requirement of 2,500 PSI. Instead it would not hold pressure above 1,200 PSI.

This pipe was supposed to be rated at 10,000PSI. From 3,500 feet on down to 8,000 feet the pipe continually leaked. Justiss kept trying to stop the leaks and to achieve a level of pressure that would allow the operation to limp forward. The effort required thirteen (13) "squeeze jobs" and drilling with a mud motor. It entailed the laborious and dangerous task of "squeezing" a section to get it to an acceptable pressure, then unsetting the packer, testing the back side, and if it was still leaking pulling up the packer, pouring in more cement, drilling through the cement after it sets, and continuing this process *thirteen (13) times*. Defendants seem to argue that Justiss' claim for theses damages should be rejected because it ultimately would not have succeeded in reaching the 15,000 feet depth originally contemplated. We find this argument unpersuasive and it contravenes the laws on redhibition applicable in this case as discussed below. The law on redhibition entitles Justiss to recover these costs regardless of whether an actual hole in the formation made it impossible to proceed any further.

**Mitigation of loss and negligence in contract law.**

**A. No reduction in damages.**

We are satisfied the trial judge did not err in awarding Plaintiff its out-of-pocket expenses, which included $391,050 (the purchase price of the defective pipe) and $1,165,460.43 (the cost for repairs to the pipe as the operation proceeded to 13,569 feet).

Although we have found comparative fault has no application to contract law, we must now determine, under the applicable provisions of our contract law, whether Justiss' damages may be reduced for any negligence on its part which may have occurred during its attempt to use the defective pipe. Faced with defective pipe cemented in the bore hole, Justiss decided to make special efforts, at its own

24

great expense and risk, over a period of almost five weeks, to proceed with drilling Musser-Davis 34-1. Defendant offered no evidence to show that Justiss should not have tried to stop the leak all the way down. Their expert merely said he would go forward, stop, go forward, stop, and do so as long as that kept working. At the end of the day, looking back up the pipe from the bottom, it would have amounted to the same thing Justiss did in fact do, and nothing here suggests the repair costs would have been less. *Justiss would not have had to do all of this but for the defective pipe.* Justiss ceased its efforts and plugged the well when it became apparent that it was too dangerous to their employees and the environment to continue.

Louisiana Civil Code Article 2002 provides:

> An obligee must make reasonable efforts to mitigate the damage caused by the obligor's failure to perform. When an obligee fails to make these efforts, the obligor may demand that the damages be accordingly reduced.

This court has long recognized the well settled doctrine of mitigation, applicable to tort and contract law in Louisiana, taken from common law, and codified in La. Civ.Code art. 2002:

> The doctrine of mitigation of damages imposes on an injured party the need to *exercise reasonable diligence and ordinary care* in attempting to minimize his damages after an injury has been inflicted. The care and diligence required of him is the same as that which would be used by a man of ordinary prudence under like circumstances. **This principle will not be applied to restrict an injured party's recovery when the injured party is required to make substantial expenditures of his own funds or incurs substantial risks in order to avoid the consequences of a breach of contract.** *See Unverzagt v. Young Builders, Inc.*, 252 La. 1091, 215 So.2d. 823 (1968). *Pelloquin v. Missouri Pacific Railroad Company*, 216 So.2d 686 (La.App. 3 Cir. 1968).

*Toce Oil Company, Inc. v. Great Southern Oil & Gas Company, Inc.*, 545 So.2d 1085, 1091-92 (La.App. 3 Cir. 1989) (emphasis added).

In the seminal case in Louisiana recognizing the application and codification of the doctrine, our state supreme court in *Unverzagt*, explained the principle:

> Perhaps the best exposition of the principle, insofar as it is pertinent to the instant matter, appears in 22 American Jurisprudence, 2d, pages 53, 61 and 282, verbo "Damages" (Sections 32, 37 and 203). Therein it is stated:

> > Section 32. Under the doctrine of avoidable consequences, the injured person need not make extraordinary efforts or do what is unreasonable or impracticable in his efforts to minimize damages; *reasonable diligence and ordinary care are all that is required to allow full recovery of all damages caused by the defendant's wrongful activity.* More completely stated, the consequences of an injury are recoverable where the injured party acts with such care and diligence as a man of ordinary prudence would under the circumstances, and his efforts to minimize damages are determined by the rules of common sense, good faith, and fair dealing. What constitutes reasonable care depends upon the circumstances of the particular case, taking into consideration time, knowledge, opportunity, and expense. An injured person may recover to the full extent of his injury where he shows reasonable grounds for his failure to make an effort to lessen his damages. Thus, the repeated assurances of the defendant after an injury has begun that he will remedy the condition is sufficient justification for the plaintiff's failure to take steps to minimize loss, so long, at least, as there is ground for expecting that he will perform.

> > 'Section 37. Following a breach, it is sometimes possible for the nondefaulting party to minimize his damages by spending a sum of money. If the courts were to require this expenditure in every case in which it turns out, as a matter of hindsight, that such expenditure would have minimized the loss, courts would effectively be requiring the innocent party to incur risks beyond those in the contract in the hope that damages could be recovered from the breacher. Therefore, courts generally do not determine damages based upon the making of these expenditures unless (1) they are small in comparison to the possible losses, and (2) it is virtually certain that the risks incurred will avoid at least a part of the loss. Damages will not be decreased through showing that a substantial expenditure would have minimized the total loss or that the suggested expenditure may or may not

26

> have decreased damages. *The defaulter is in no position to cast this risk of substantial expenditures on the plaintiff. Since such risks arose because of the breach, they are to be borne by the defaulting party.*

Unverzagt, 252 La. at 1097–98 (emphasis added).

In her reasons for judgment the trial judge stated:

> The Court is satisfied that the jury, like this Court, heard sufficient evidence from the defense that mitigation of costs could have best been addressed by the plaintiff by ending their exploits sooner rather than later and by changing the drilling to a more shallow depth. The additional damages requested by plaintiffs, unlike those of redhibition, are subject to comparative negligence and apportionment of fault. Considering this, the Court determines that the jury's findings, as to this aspect are supported by a fair interpretation of the law and evidence. The jury found that Justiss contributed to its own damages and assigned the percentages of 10/90.

Having made this statement the judge nevertheless awarded Justiss full recovery for repairs. Justiss is indeed entitled to full recovery for the costs of repairs, which, we have already said in this case, includes its almost five weeks effort. As the court noted in *Toce*, the principle of mitigation of damages "will not be applied to restrict an injured party's recovery when the injured party is required to make substantial expenditures of his own funds or incurs substantial risks in order to avoid the consequences of a breach of contract." *Toce*, 545 So.2d at 1092. No amount of negligence or fault may be ascribed to Justiss for engaging in its good faith effort to try to find a way to make Defendant's defective pipe work. *Notably, Defendants' expert does not say Justiss' effort was unreasonable.* The evidence shows Justiss' efforts were diligent and reasonable. Even defense expert Dr. Wooley said in his opinion it was safe to proceed under the circumstances with the pipe holding lower pressure, and he himself would have done so, at least down to the 13,569 foot depth**.** *Defendants failed to establish that Justiss should have stopped sooner and that it failed to properly mitigate its losses.*

27

## B. **No reduction for consequential damages—"lost profits"**

We find the trial court committed legal error in applying comparative fault to reduce the consequential damage award. The judge said Justiss tried too hard for too long, that it should have only tried drilling to a more shallow depth. The judge employed this notion to reach her conclusion that Justiss' recovery of lost profits should be reduced by 90%. This concept is simply not in accord with settled contract law. The real question here regarding Justiss' entitlement to consequential damages is whether Defendant *proved* some intervening cause, other than the defective pipe, was the reason for Justiss' failure to reach the contract depth of 15,000 feet.[6] The burden was on Defendants to prove such an intervening cause. *Rey* and *Tucker*. As we have discussed at length above, they failed to do so. Defendants failed to rebut the evidence put forth by Justiss through expert testimony, witnesses who were on the scene, and records and drilling logs, the veracity of which Defendants do not dispute. The evidence, under careful scrutiny, reveals Justiss could not get to 15,000 feet, despite its valiant efforts and great expense*, for no other reason proved than Defendants' defective pipe*. Defendants cannot escape liability for all damages due Justiss as a result of providing defective pipe by *hypothesizing* that some *unknown and speculative* intervening cause, i.e. *a phantom hole in the formation*, resulted in shutting in the well before completion. Defendants squandered their opportunity to gather all the proof they needed to validate their "dry hole" theory. They chose to forego visiting the site and opted to rely solely on speculation and the fact that a

---

[6] Justiss' contract was clear, if it did not drill the well to 15,000 feet it did not get a dime. The evidence is also clear, Justiss would only be paid by MidStates under its turnkey contract if it completed the well to a certain specified depth which was deeper than the shallow depth suggested by the trial judge.

neighboring property had a dry hole. The trial court obviously rejected the dry hole assertion as do we for the reasons stated herein. The fact that Justiss' efforts to bring in the well despite the defective pipe proved futile in the end does not visit the loss on Justiss. Justiss' loss of profits occasioned by in its inability to complete the well using Defendants' defective pipe is a loss to be bourne by Defendants. Justiss is entitled to the full sum of its lost profits with no reduction of those damages.

**Conclusion**

Defendants maintain that, after selling Justiss defective pipe for the sum of $391,050.20, Defendants should be left to pay Justiss only the $25,000 awarded by the jury. Moreover, despite their failure to assert the pipe was not defective, Defendants posit that either: the defective pipe did not cause the inability to complete the well; Justiss should not have used this type of pipe for this well; Justiss should not have cemented casing in the hole and had they not done so Defendants could have provided good pipe; Justiss should not have tried to make the defective pipe work, but, having tried to mitigate its loss, Justiss should have stopped its efforts sooner and not spent so much on its efforts; or, a speculative natural cause was the reason for shutting in the well before completion. None of these theories stand up to scrutiny when viewed in light of the record evidence and the applicable law and jurisprudence. Faced with defective pipe, cemented in the ground before discovering any problem with it, Justiss met its duty to attempt to mitigate its loss caused by Defendants' breach, and went well beyond what was required to meet that duty. The law does not fault Justiss in hindsight for its tenacity, and does not allow a reduction in Defendants' damages on the basis that Defendants or the trial court, in hindsight, would have chosen to proceed

differently. Had Justiss' efforts to "make do" with the defective pipe proved successful, Defendants would have been liable for the costs so incurred by Justiss, and would have enjoyed the benefit of Justiss' mitigation of loss. It was not "negligent" for Justiss to make efforts, at its own risk and expense, which were reasonable under the circumstances and in good faith, trying to work with defective pipe and minimize its loss. It is worthy of note that Justiss was not only mindful of the profit it would lose by failing to complete the well to the contracted depth, but also the incalculable damage to its reputation caused by failing to bring in the well, whatever the reason.

> According to views expressed by the Louisiana jurisprudence, a party who has been required to make substantial expenditures of his own funds, or to incur substantial risks, in order to avoid the consequences of a breach of contract *should not be restricted in his right to recover for those expenses and those risks*. *Toce Oil Company, Inc. v. Great Southern Oil & Gas Company*, 545 So.2d 1085, 1092 (La. app. 3d Cir. 1989). *See also* Ernest Simon & Son v. Perma-Clad of Georgia, Inc., 459 So. 2d 213 (La.App. 3d Cir. 1984). Such views were expressed in a case where, upon a drilling contractor's failure to dig a well, in an attempt to avoid further loss, the landowner who had engaged the services of that contractor made a contract with another drilling company for the same purpose, but the other company not only also failed to dig a well but, because of bankruptcy, was unable to refund the sums the landowner had advanced for the unperformed work. 545 So.2d 1086-1088. In that case the court allowed the landowner to recover the sums paid to the second contractor because, according to the court, the first contractor's failure to perform his obligation left the landowner with no other choice than incurring that expenditure. The court reflected that the landowner could not be faulted for having chosen a course of action that resulted, precisely, because of the lack of another choice. *Toce Oil Company, Inc. Great Southern Oil & Gas Company, Inc.* 545 So. 2d 1085, 1092 (La.App. 3 Cir. 1989). *See also Ernest Simon & Son v. Perma-Clad of Georgia, Inc.*, 459 So.2d 213 (La. App. 3d Cir. 1984).

6 La. Civ. L. Treatise, Law of Obligations § 10.9 (2d ed.)

Likewise, the evidence shows Justiss was unable to complete the well to contract depth due to Defendants' defective pipe and Defendant failed to prove any

30

intervening cause which would diminish or prohibit full recovery for consequential damages, i.e. lost profits.

**Decree.**

For the reasons stated, we reverse the trial court judgment insofar as it assigned any amount of fault to Justiss. In all other respects, we affirm the granting of the JNOV and the trial court's award of damages except we further amend the judgment below to deduct the purchase price from the award of consequential damages. The award for consequential damages is hereby amended to reflect an award of $2,445,682.80. We award additional attorney fees for this appeal in the amount of $10,000.00. All costs in the trial court and this court are assessed against Defendants.

**AFFIRMED IN PART, REVERSED IN PART, RENDERED.**

JUSTISS OIL COMPANY, INC.

VERSUS

OIL COUNTRY TUBULAR CORPORATION, ET. AL.

SAVOIE, J. CONCURS IN PART, AND DISSENTS IN PART WITH WRITTEN REASONS.

I disagree with the majority's conclusion to award the plaintiff with $2,445,682.80 in consequential damages, which is the profit the plaintiff would have received had it drilled to the depth contemplated by its contract. I would not award any consequential damages for lost profits to the plaintiff based on the jury's finding on that issue. I otherwise concur in the result of this case.

I would find error in the trial court's decision to grant the JNOV as to the jury's finding in interrogatory number three on the special verdict form that the defective casing did not proximately cause the plaintiff's damages. The jury instructions indicate that this interrogatory was directed toward the question of whether the defective casing was the proximate cause of the plaintiff's consequential damages, or lost profits. The jury was instructed to decide "whether th[e] casing was a cause in fact of the losses suffered by Justiss," and was then told by the trial judge that:

> [b]y cause "cause in fact" I mean you must determine whether the defective casing **was a substantial factor in preventing Justiss from completing its contract and drilling the Musser-Davis 34-1 Well to its contract depth.** In other words, if you find that Justiss would have completed the Musser-Davis 34-1 well to its contract depth but for the defects in the casing, then the defective casing is a cause in fact of the Justiss loss.

(emphasis added).

Interrogatory number three is not impermissibly inconsistent with the interrogatories seeking fault allocation. The jury instructions indicate that the interrogatories pertaining to fault allocation relate to the cause of the *defect* in the casing. The jury was instructed that the defendants would not be liable if the defendants proved that the defects in the casing were caused by the plaintiff's own misuse of the casing or that the defect in the casing did not ultimately cause the *casing* to fail and render it useless. This issue is distinct from what caused the plaintiff's *consequential damages* (i.e. lost profits from failing to reach the contract-depth), which was addressed in interrogatory number 3. The jury's finding as to whether the defect caused the plaintiff's consequential damages is reasonably supported by the evidence in the record and should not be disregarded.